Docket No. 102550.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JACOBY WHEELER, Appellant.

*Opinion filed June 21, 2007.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Freeman, Fitzgerald, Kilbride, Karmeier, and Burke concurred in the judgment and opinion.

## OPINION

On March 12, 1999, Demetrian Forrest was found dead, slumped over in the driver's side of his car, in Decatur, Illinois. The State alleged that defendant, Jacoby Wheeler, and his codefendant, Shannon Hunter, murdered Forrest to prevent him from testifying against Wheeler in a separate criminal case. Both men were charged with first degree murder. 720 ILCS 5/9–1(a)(1) (West 1998).

On September 19, 2001, a jury in the circuit court of Macon County found defendant and Hunter guilty. Subsequently, the jury found them both eligible for the death penalty because they (1) murdered Forrest to prevent him from testifying (720 ILCS 5/9–1(b)(8) (West 1998)), and (2) committed the murder in a cold, calculated and premeditated manner pursuant to a preconceived plan

(720 ILCS 5/9–1(b) (11) (West 1998)). Defendant waived a jury for sentencing.

On January 2, 2002, the trial court sentenced defendant to 55 years' imprisonment, finding sufficient mitigating factors to preclude a sentence of death. Defendant appealed his conviction and sentence. The appellate court initially affirmed unanimously. After defendant petitioned for rehearing, one justice dissented. No. 4–02–0131 (unpublished order under Supreme Court Rule 23).

Defendant appealed to this court pursuant to Rule 315 (210 Ill. 2d R. 315). Defendant contends that: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the prosecutor's comments in closing arguments denied him a fair trial; (3) the trial court erred in refusing to allow evidence that William Ellzey killed Forrest; (4) defense counsel was ineffective for eliciting details of other-crimes evidence; and (5) the trial court erred in not excusing juror Brian Thomas.

BACKGROUND

On the evening of March 12, 1999, Decatur police officer Shane Brandel and Detective Daniel Street were investigating a burglary, unrelated to this case. As Brandel and Street were speaking with the occupants of a house at 1329 East Main Street in Decatur, they heard gunshots. Stepping outside onto the front porch and heading toward the street, Brandel and Street saw two men running toward them through a vacant lot.

Brandel testified that the faces of the two men were dark and thus he inferred they were black. One suspect wore a black coat while the other wore a dark coat and seemed to be three or four inches taller than the other. Street testified that both men wore dark clothing and, at the time, he believed them to be roughly the same height and build.

Brandel stated that the man in the black coat lifted his coat and reached under his waistband. Though he did not see the black-coated man pull anything out, Brandel reached for his pistol. At that point both suspects turned around and began running north. Street testified that after Brandel said something along the lines of "Stop, police[!]" the two suspects turned and ran north. Brandel pursued the suspects

-2-

on foot while Street returned to his vehicle and drove west on Main Street, listening to Brandel's reports on the radio.

While Brandel was pursuing the suspects on foot he lost sight of them twice. The first time, he lost sight of them for four to five seconds as he rounded a corner into an alleyway between East Main and East Prairie Street. The second time, he lost sight of the suspects for about 20 seconds when they darted between some houses on East Main. Brandel testified that, when the suspects again came into view, he was certain, based on their clothing and build, they were the same suspects he had been chasing. Eventually, the suspects parted, each running on an opposite side of a motor home parked in a lot between 1212 and 1228 East Main Street. Brandel followed the closest suspect, the one in the blue coat, and arrested him on the front porch of the house at 1212 East Main. That suspect was Shannon Hunter. Brandel testified that he did not see any other persons during his pursuit.

Brandel was unable to recall whether Hunter was short of breath or perspiring when he was arrested. Brandel stated that he did not see either suspect discard anything during the chase. He did not believe the suspects were wearing masks or eyewear and did not notice any stripes or different colors on their coats, describing them only as solid blue or black. Defendant's counsel showed Brandel a black coat with white stripes that other police officers found in a driveway between the houses at 1229 and 1237 East Main Street, a few blocks away from the scene of the shooting. Brandel could not identify it as a coat worn by either suspect.

During the chase, Brandel noticed a car parked 150 feet northeast of the point where he first spotted the suspects. The police later discovered Forrest's dead body in that car. He had been shot in the head, left arm, left thigh, and right thigh. Though the car was in neutral and the stereo was blaring, it was not running. The driver's side window was shattered and shards of glass were strewn on the street in front of 120 North Stone Street and at the point where the car had come to rest slightly northwest of that location. Two bullet holes were found in the driver's door, one bullet was found on the front passenger floorboard, and one was found in the panel of the front passenger door.

Street testified that as he drove west on Main Street he noticed police cars with lights on at Jasper Street. He turned left (south) onto Jasper Street and continued to the intersection of Wood and Jasper. At the intersection, Street saw a black man in dark clothing run onto Wood Street from the north.

The man crossed Wood Street and ran toward the east side of Walgreens at 1201 East Wood. At that point, Street lost sight of him behind a fence. Street continued south on Jasper Street and, turning east onto Clay Street, stopped mid-block with his car headlights off. Street saw the man emerge from between some houses, stop on the sidewalk, and then walk on Clay Street at a normal pace. Eventually, the man crouched and hid under a bush at 1304 East Clay Street. Street testified that, at that point, he had not seen any other foot traffic on Clay Street.

After he saw the man hide under the bush, Street radioed police dispatch. Not a minute later, another Decatur police officer, Shawn Guenther, pulled the man out from under the bush. That man was defendant, Jacoby Wheeler. Street testified that this was the same man he saw running toward him after hearing gunshots while he and Brandel were at 1329 East Main Street.

However, Street was not able to identify Hunter as the other suspect he saw running toward him. Additionally, he did not notice either suspect make any drastic change of clothing, nor did he notice stripes or hoods on the suspects' coats. Street further admitted that the black coat shown to him at trial had white stripes down each sleeve which, had he noticed, he would have described in his report.

Jason Derbort, another Decatur police officer, also testified. Derbort responded to a report of shots fired, parked his car at the intersection of Main and Jasper Streets, and turned off his headlights. Seeing a black man in dark clothing and a dark coat run out of the lot where the motor home was parked, Derbort turned on his headlights and emergency lights, got out of his squad car, and yelled at the man to stop. Derbort testified that the man then headed southeast. Soon after the event, however, Derbort wrote in his police report that the man ran south. Regardless, Derbort testified that he followed the man and could see that the dark coat he was wearing had white stripes down the sleeves.

As the man continued to run, Derbort lost sight of him for around two seconds as he ran through the driveway between 1229 and 1237 East Main Street. When he saw the man again, he was no longer wearing the dark coat but was now clad in a green and yellow jacket. The man continued running, crossed Wood Street, fled between 1295 and 1305 Wood Street, and jumped a chain-link fence. Derbort, unable to jump the fence due to the weight of his full winter gear, went around the fence in pursuit. He testified that he saw no other foot traffic as he pursued the man. When Derbort again saw the man, Officer Guenther was ordering him out from under the bush at 1304 East Clay. As noted, that man was Jacoby Wheeler and he was wearing the green and yellow jacket Derbort had seen while in pursuit.

Retracing the route the suspects had taken, police found various items. Where the suspects initially turned and ran from Brandel and Street, police found a .22-caliber revolver containing five live rounds and one spent round. Along the suspects' route of flight, police found a ski mask lined with a pair of nylon stockings, a black neoprene mask, a stocking cap, and a .357 Magnum chrome revolver containing two live rounds and four spent rounds. The neoprene mask, stocking cap, and .357 Magnum revolver were not found in the initial police search. Instead, those items were found in a search just after midnight on March 13, 1999, when police discovered that more than one gun might have been involved in the shooting. Brandel noted that those items were found at a time when the area was no longer secured. Brandel explained that to be secured means that an area is controlled in such a way that the integrity of the crime scene is maintained and no unauthorized persons are allowed into or out of the area.

In addition to the above, police also found two right-hand brown jersey gloves on the front bumper of the motor home where the suspects parted company. Further, they found a black coat with the sleeves turned inside out and the white lining facing upward in the area where Officer Derbort had lost sight of the man who he claimed turned out to be Jacoby Wheeler. Police wore gloves in picking up each item of evidence, but did not change their gloves from one item to the next. Additionally, each item was photographed where it lay and the photographs were admitted into evidence at trial.

-5-

The day after the murder, Deosha Singleton, defendant's girlfriend of seven years, told Detective Gannon that she overheard defendant and Hunter speaking to each other on the day of the murder. According to Singleton, she heard someone saying "I'll do it. I'll do it" and someone saying "do it" and the other saying "no." At trial, however, she testified that she had lied to Gannon because she wanted to leave the police interview room. Teronica Jones, with whom codefendant had a son, testified that Hunter used her car on March 12, 1999. She further testified that she picked up the car the next morning at Main and East Streets. Jones acknowledged, however, that she had made a contradictory written statement that she retrieved the car about 2½ blocks southwest of where Forrest was killed.

Two women, neither of whom knew defendant or Hunter, but both of whom lived near the alley where Forrest was found dead, also testified. Misty Gilman testified that she heard gunshots the night of March 12, 1999. After hearing the shots, she looked outside her apartment at 1423 East Prairie Street and saw two persons in the alley and three persons on the sidewalk head toward Prairie Street. One of the men in the alley wore a red and black Chicago Bulls jacket. Gilman acknowledged that she made a contradictory written statement that she had seen only three persons, two in the bushes right off the alley and another going north. Tamara Hodges testified that she heard a car pull up near her home at 1363 East Prairie around 8:45 p.m. on March 12, 1999, and just sit there. She heard gunshots, looked out her window, and saw two black men run north on Stone Street, jump into a sports car, and drive west on Prairie Street. Hodges further testified that when the car drove off in a westerly direction she did not remember hearing any tires squealing or similar noises.

Little forensic evidence tied defendant directly to the items of evidence found by police. Eric Young, a forensic scientist specializing in trace chemistry, testified that if someone had stepped on broken glass, it was likely, though not certain, that fragments of the glass would become embedded in the soles of that person's shoes. He further testified, however, that such fragments could become dislodged by running. While some glass was found in defendant's

shoes, that glass did not match the glass from Forrest's shattered car window.

The ski mask and stocking cap found by police contained human head hairs that did not come from either defendant or Hunter. No blood was found on either man's clothing. The firearms and ammunition recovered by police did not yield fingerprints. No gunshot residue was found on the jacket defendant was wearing when he was apprehended. However, gunshot residue was found on Hunter's coat, the brown gloves, and the black coat with white stripes police found along defendant's purported path of flight. Defendant challenged the accuracy of the residue finding, though, by introducing testimony establishing that failure to change gloves or clean evidence-processing surfaces can result in gunshot particles being transferred from one exhibit to another.

Travis L. Hindman, a forensic pathologist called by the State, testified that it was his opinion that Forrest suffered a fatal head wound at point-blank range from either a .22- or a .25-caliber bullet. Moreover, he testified that the leg wounds Forrest suffered came from a medium-class pistol such as a .357 Magnum or a .38 caliber while the hollow-point bullet in Forrest's left arm definitively came from a .357 Magnum handgun. Robert J. Hunton, a forensic scientist called by the State, also concluded that the bullet from Forrest's left arm came from a .357 Magnum handgun. Moreover, Hunton concluded that the bullet came from the exact .357 Magnum chrome revolver police recovered in this case. His opinion was based upon rifling marks on the bullet that were distinctive to bullets fired from that particular weapon. Using the rifling-mark technique a second time, Hunton concluded that the bullet on the passenger floorboard and the one in the passenger front door also came from that revolver.

Evidence at trial indicated that defendant and Hunter associated with each other before the murder. Winifred Forrest, Demetrian Forrest's grandmother, testified that defendant and Hunter played billiards together multiple times a week during the summer and fall of 1998. She also testified that defendant had previously been friends with Demetrian.

Michael Cunningham, an acquaintance of defendant, saw defendant and Hunter at a party days before the murder. Cunningham testified that everyone at the party, including himself, was drinking

alcohol and smoking marijuana. Though his memory was hazy, Cunningham remembered mentioning that if he were Jacoby Wheeler, he would pay Forrest not to testify. Though he was not completely certain, Cunningham also remembered Wheeler, or perhaps someone else, remarking that he did not want to go back to prison. Cunningham further testified that he saw that defendant had at least one handgun with him when he left the party with Hunter.

Though Cunningham denied making any deal with the State for his testimony, he did indicate that he could not remember everything that happened. Further calling into question his testimony, a defense investigator, Dean Paisley, testified that Cunningham admitted to him that anything he had told the police was a "combination of what he recalled from his mental state of drinking and using drugs and his desire to get any sentence he may receive reduced." Cunningham, however, denied making that statement.

In support of its case, the State elicited testimony to establish that defendant had a motive to murder Demetrian Forrest. Macon County State's Attorney Scott Rueter testified that in 1998, while he was an assistant State's Attorney, he was assigned to prosecute a case, eventually scheduled to go to trial on March 16, 1999, in which defendant was charged with the attempted first degree murder and aggravated battery with a firearm of Angelo Williams. Rueter testified that during discovery in that case, he disclosed Demetrian Forrest as a witness. Rueter indicated that it was his belief that Forrest's testimony would, along with other evidence, implicate defendant. Lisa Holder White, defendant's attorney at the time Forrest was disclosed as a witness, testified that while she was aware that the State might call Forrest as a witness she did not know that for sure.

To rebut any suggestion that Forrest was killed because he was to be a witness against defendant in the Williams case, the defense proffered evidence that Forrest was an informant in other cases and had testified against William Ellzey, the highest ranking member of the Gangster Disciples in Decatur. That evidence would have shown that Ellzey had received a sentence of imprisonment for life in an unrelated criminal proceeding; that Forrest had "lost" some of Ellzey's drugs; that Forrest had been behind in payments to Ellzey; that Forrest had been physically "disciplined" for coming to Ellzey with a gold necklace instead of a cash payment; and that Forrest had

-8-

some relationship with Ellzey's girlfriend. In addition to the above evidence, Hunter made an offer of proof that Demetrian Forrest's grandmother Winifred Forrest feared for his safety and was uncomfortable because of his testimony against William Ellzey. The defense contended that their proposed evidence would have shown a theory for which the jury could infer that someone other than defendants murdered Demetrian Forrest.

The trial court ruled that the information regarding Ellzey was too speculative to be allowed before the jury. The court ruled that the defense could not ask Winifred Forrest if she feared for Demetrian's safety. Moreover, the court told defendants that while they were free to argue that someone else murdered Forrest, "as far as arguing that someone else in particular did it" such evidence was "way too speculative to allow to go before the jury."

At the beginning of his closing argument, after thanking the jury for its attention and determination, the prosecutor made the following comment, which defendant now challenges before this court:

> "MR. CURRENT [Prosecutor]: A murder case is an unusually difficult type of case for the prosecution to prove because the defendant has killed the main prosecution witness. The deceased never gets to testify. The deceased never gets to tell his side of the story.
>
> Then, who is left to take up his cause and try to speak for him? Often, it's a lone prosecutor, a stranger, who is left to champion the deceased. A solitary figure appears in Court bearing the burden of avenging another's death and presenting the truth to a jury and the Court. But, often time [*sic*], justice only requires a solitary champion because truth and justice is not a load as heavy as it appears. The load has an unspeakable lightness."

Throughout the course of the rest of his argument, the prosecutor made a number of other comments that defendant also challenges:

> "MR. CURRENT: I would suggest to you that you jurors lead sheltered lives. You stepped into a world, over a month ago, that to many of you never existed. You have no idea what kind of criminals and serious crime are lurking out there. There are dangerous people. There are mean streets. Not

everyone lives in a peaceful neighborhood like you or has safe neighborhoods.

The police are often referred to as 'the thin blue line'. Well, what does that mean, 'the thin blue line'? The police are there to protect you from the likes of Kenneth Lovelace, Gregory Williams, Andre Eubanks, Sean Marshall, Timothy Glass, Franklin Small. Who do citizens call–citizens of this County call when they need assistance? Who do citizens call when someone is breaking into their house or assaulting them? The police do not call Kenneth Lovelace, Gregory Williams, Andre Eubanks, etc.

When you get up in the morning or your spouse gets up in the morning or a family member gets up in the morning and you go to work, are you risking your life to earn a paycheck? Are you putting your life on the line when you go to the office or your work? Yet, police-bashing seems to be a semi-popular sport until a citizen is in distress. Then, that same officer is expected to come to a citizen's salvation.

Well, who do citizens want to serve and protect them in times of need? I would submit they want officers like Shane Brandel and Dan Street and Jason Derbort.

Shane Brandel, you look at him, he looks like the boy who grew up next-door. The boy who grew up in the neighborhood who's finally an adult.

Dan Street. Here's a man who served 4 years in the United States Marine Corps and then continued his service with the Decatur Police Department. A reserved, deliberate, low-key man.

That's the advantage of a Jury Trial. You get to eyeball a witness when he testifies. You get to see him. You get to see how he reacts to questions, prosecution questions, defense questions. You get an idea for what kind of person you are dealing with.

I would suggest to you that Shane Brandel and Dan Street are part of the new breed of policeman. These are men who are educated, intelligent, and well-spoken. They're not the

coarse, musclebound brutes who can't find any other way of making a living.

* * *

MR. CURRENT: Your eyes have, also, noticed that each defendant has two attorneys for a total of four attorneys representing these defendants. And contrary to representations made to you during the jury selection or voir dire, you have seen with your own eyes these are not two completely different independent teams of lawyers. You watch with your own eyes as they converse frequently. One will go back and ask another for assistance; one will talk to another attorney; then go back and start asking the same questions or different questions.

MR. BAXTER [counsel for Wheeler]: Objection, your honor.

THE COURT: Sustained.

MR. BAXTER: Thank you.

MR. CURRENT: You have four lawyers with in excess of 100 years of legal practice and 75 years of school grilling Shane Brandel.

MR. MATTINGLEY [counsel for Hunter]: Again, objection.

THE COURT: Sustained.

MR. BAXTER: Thank you.

MR. CURRENT: Consider who was questioning Shane Brandel and Dan Street; for Shane Brandel, an entire afternoon and an entire morning, and for Dan Street, four hours.

MR. BAXTER: Same objection, Your Honor.

THE COURT: Overruled.

MR. CURRENT: Don't you think that vast array of legal talent who have had 2½ years to study this case inside out, top to bottom, is going to find some discrepancy with which they can hurl their mighty harpoons? If you didn't know it now, you do know trial lawyers are Monday morning quarterbacks.

-11-

MR. CURRENT: Every Monday morning, they can tell you all the bad decisions the quarterback made the previous day while he was being double-blitzed.

A trial lawyer can dissect, bisect, and magnify any past action, all with the benefit of 20/20 hindsight and all with the benefit of time and numbers. But, in the final analysis, the attorneys weren't there risking their lives on March the 12th of 1999. They were not in the arena.

MR. BAXTER: Objection, Your Honor.

MR. MATTINGLEY: Objection.

THE COURT: Overruled.

You may continue, Mr. Current.

MR. CURRENT: The policemen were in the arena. So, in light of all this, is it too surprising that the defense attorneys obtained what they thought were some points in their favor? But, the rules of the game at which attorneys defend, operate, and go under seem to require a complete perfection on the part of a witness. If a witness isn't perfect, then, the skill of the attorney has revealed the witness to be a liar, the witness to be stupid, or the witness to be confused–

MR. BAXTER: Objection, Your Honor.

THE COURT: Overruled.

MR. CURRENT: –any of which render the witness unworthy of belief. But, in the everyday real life world in which we all live, there is no perfection. In the real world, we judge each other by a less exacting standard. We realize that most people are hard-working, conscientious, capable, honest, and good-hearted people who do their best in a difficult and trying world. Can you think of any 2 minutes in your life in which you could withstand a full day of cross-examination by a four-lawyer team?

MR. DAVIS: Judge, I object. He's placing the Jury–

THE COURT: Sustained.

MR. CURRENT: Could you withstand–

MR. DAVIS: I object, Judge. He's asking–he's putting the Jury in the place of the parties.

THE COURT: That objection is overruled.

MR. CURRENT: The attorneys made a great deal to[-]do about the police reports of Shane Brandel and Dan Street. Now, as a citizen, when you call the police, you expect an instant response. Even sooner if your life is at stake. You don't want to call 911 only to be told by the dispatcher the following message: 'All available police officers are typing police reports at their typewriters and word processors at the present time. As soon as they are done performing their secretarial duties, they will be sent out on the street. And for your information, most of these officers just came in from a murder case, and we know how exacting[ly] the defense attorneys will cross-examine them.'

MR. BAXTER: Objection.

THE COURT: Sustained.

MR. BAXTER: Ask the Jury to be instructed and to disregard that.

THE COURT: The Jury is instructed to disregard the last comment.

Proceed, Mr. Current.

MR. CURRENT: '*We know how closely their words will be examined; so, you can expect an additional 4 or 5 hours before the officers will be available so they can make sure that every word i[s] perfect, all syntaxes.*'

MR. BAXTER: I object to that.

THE COURT: Overruled.

MR. CURRENT: Your honor–

THE COURT: Continue, Mr. Current.

MR. CURRENT: –I would like to–

THE COURT: Go ahead.

MR. CURRENT: '*Every word is perfect, all syntaxes are acceptable, and all paragraphs are sufficiently long enough to gain approbation from anyone.*'

* * *

Mr. CURRENT: *** Then, last Thursday, you experienced a very sad and disgusting day when Lisa Holder White took the Witness Stand. A judge is a lawyer, but a judge, also, takes an oath to support and defend the Constitution of the United States and the Constitution of the State of Illinois and to enforce the laws of this State. Her testimony, last Thursday, at the behest of Jacoby Wheeler's attorney was revolting to any person who values the truth.

MR. DAVIS: Objection.

THE COURT: Sustained.

MR. BAXTER: Ask the Jury to be instructed to disregard.

THE COURT: Disregard that comment, Ladies and Gentlemen.

MR. BAXTER: Thank you.

MR. CURRENT: *** As she [Lisa Holder White] testified, one had visions of William Jefferson Clinton flashing before our eyes.

MR. DAVIS: I object to that.

THE COURT: Overruled.

MR. CURRENT: Whether one is a Democrat, a Republican, or Independent, her performance was vintage Bill Clinton. While testifying before a Federal Grany Jury and when pressed on an issue, Clinton responded, '*It depends on what your definition of 'is' is.*' At a news conference, Bill Clinton pointed his finger at the camera, while discussing Monica Lewinski, and declared, '*I never had sexual relations with that woman.*'

MR. BAXTER: Objection.

THE COURT: Overruled.

MR. CURRENT: I guess it depends on what your definition of what 'sexual relations' is.

***

MR. CURRENT: If you want a frank assessment of John Platzbecker, the police officer, maybe, his elevator doesn't run all the way to the top floor.

-14-

* * *

MR. CURRENT: Mr. Demetrian Forrest dies March 12th of 1999, and Dean Paisley is going out June 26th of 2001, in the middle of the summer, to take some pictures for you. Two years and three months later, somebody decides, well, it might be nice to have some pictures and it might be nicer if we took them in the summertime which is completely different from the winter as far as foliage and growth and, maybe, the Jury will fall for it. Donald Hopper–

MR. BAXTER: Objection, Your Honor.

THE COURT: Overruled.

MR. CURRENT: Donald Hopper. He waits until after jury selection starts. We're all in here trying to pick a jury, and he's out there snapping pictures. Now, it's two years and five months later, and he's out there taking pictures. Now, how serious are they about giving you accurate and fair information?

* * *

MR. CURRENT: *** You've also noticed from closing arguments from the defense, you hear everything twice. You hear the prosecution's story once. You hear the defense twice. It's almost like being in a room being brainwashed. Just because you hear it over and over and over doesn't mean it's true. All it means is you're hearing it more times than you've heard it from the other side." (Emphases in original.)

The jury found the defendants guilty as charged and eligible for the death penalty in September 2001. Both defendant and Hunter waived a jury for sentencing. Having found sufficient mitigating factors to preclude a sentence of death, the trial court sentenced defendant (as well as Hunter) to 55 years' imprisonment. We will consider each of defendant's arguments in turn.

ANALYSIS

I. Sufficiency of the Evidence

Defendant claims that the evidence in this case is insufficient to prove him guilty of first degree murder beyond a reasonable doubt. If

-15-

he is correct, his conviction must be reversed. The Criminal Code of 1961 provides:

> "A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
>
>> (1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or
>>
>> (2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another[.]" 720 ILCS 5/9–1(a)(1), (a)(2) (West 1998).

With this statute in mind, we will consider defendant's claim.

As this court has noted, "[t]he due process clause of the fourteenth amendment to the United States Constitution requires that a person may not be convicted in state court 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004), quoting *In re Winship*, 397 U.S. 358, 364, 25 L. Ed. 2d 368, 375, 90 S. Ct. 1068, 1073 (1970). When reviewing a challenge to the sufficiency of the evidence, this court considers whether, viewing the evidence in the light most favorable to the State, " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (Emphasis in original.)' " *People v. Collins*, 106 Ill. 2d 237, 261 (1985), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); see also *People v. Smith*, 185 Ill. 2d 532, 541 (1999). The United States Supreme Court has stated that "the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 318, 61 L. Ed. 2d at 573, 99 S. Ct. at 2788-89. This standard of review applies, "regardless of whether the evidence is direct or circumstantial [citation], and regardless of whether the defendant receives a bench or jury trial [citation]." *People v. Cooper*, 194 Ill. 2d 419, 431 (2000).

-16-

This court will not retry a defendant when considering a sufficiency of the evidence challenge. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). The trier of fact is best equipped to judge the credibility of witnesses, and due consideration must be given to the fact that it was the trial court and jury that saw and heard the witnesses. *Smith*, 185 Ill. 2d at 541-42. Accordingly, a jury's findings concerning credibility are entitled to great weight. *Smith*, 185 Ill. 2d at 542.

The simple fact that a judge or jury accepted the veracity of certain testimony does not guarantee reasonableness, however. As we have previously stated, "[r]easonable people may on occasion act unreasonably" and, thus, while a fact finder's decision to accept testimony is entitled to deference, it is neither conclusive nor binding. *Cunningham*, 212 Ill. 2d at 280. Accordingly, a conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt. *Smith*, 185 Ill. 2d at 542.

Supporting defendant's conviction, the State argues that, viewed in the light most favorable to the prosecution, evidence at trial showed that: (1) defendant knew and had associated with Hunter and Forrest; (2) Forrest was a likely State's witness in a murder trial against the defendant; (3) defendant's attorney knew that Forrest would likely testify against defendant in the murder trial; (4) defendant found out that Forrest was going to testify against him; (5) defendant told people that he did not want to go to prison; (6) defendant had access to and possessed handguns; (7) two men matching defendant's and Hunter's general descriptions ran away from the murder scene and were spotted by police officers; (8) the police officers gave chase and found defendant hiding in the bushes; and (9) gunpowder residue was found on a jacket that defendant discarded as he fled from police. All of this, the State argues, makes it neither improbable nor irrational that a jury would convict defendant of first degree murder.

Defendant, on the other hand, argues that the State's evidence was insufficient to meet its burden of proof. Defendant points out a lack of eyewitnesses. Moreover, defendant believes the lack of forensic evidence to be critical. As noted in the background, no gunshot residue was found on defendant. Though there was a good deal of

-17-

blood in Forrest's car and evidence indicated he was killed at close range, defendant had no blood on him. While defendant wore soft-soled shoes conducive to picking up glass and the driver's side window of Forrest's car was shattered, leaving glass strewn about the street, the only glass found in defendant's shoes came from some other source. No fingerprints were found tying defendant to the murder. Though some human head hairs were found in the mask and stocking cap recovered by police, those hairs did not belong to defendant.

Additionally, defendant attempts to reanalyze the evidence, pointing out situations where the jury could have drawn inferences tending to exculpate defendant. For example, where the State explains the lack of blood found on defendant by noting expert testimony that any blood would have ejected away from the shooter in this situation, defendant notes that the expert refused to say that no blood came from the entrance wound and photos in evidence did show small amounts of blood on the driver's side roof of the car. This, the defense contends, could support an inference that whoever shot Forrest would have been spattered with some blood. Since no blood was found on defendant, then, it could further be inferred that defendant was not the murderer.

While defendant's arguments are well-taken, a reviewing court must give the State the benefit of all reasonable inferences. *Cunningham*, 212 Ill. 2d at 280. As already discussed, the evidence analyzed in challenges to the sufficiency of the evidence must be considered in the light most favorable to the prosecution. *Jackson*, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789; *Cunningham*, 212 Ill. 2d at 280 (citing *Jackson* for the same proposition). This court has stated that this "means the reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *Cunningham*, 212 Ill. 2d at 280.

Defendant contends that the State, and the appellate court on review, failed to properly consider all of the evidence. In *Jackson*, the Supreme Court stated that on appeal "the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (Emphasis in original.) *Jackson*, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789. Defendant thus

argues that appellate review must include consideration of all of the evidence, not just the evidence convenient to the State's theory of the case. We agree.

However, the mandate to consider all the evidence on review does not necessitate a point-by-point discussion of every piece of evidence as well as every possible inference that could be drawn therefrom. To engage in such an activity would effectively amount to a retrial on appeal, an improper task expressly inconsistent with past precedent. *Smith*, 185 Ill. 2d at 541. Indeed, this court has stated that even "the trier of fact is not required to disregard inferences which flow normally from the evidence and to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Hall*, 194 Ill. 2d 305, 332 (2000). We have also stated that "[t]he trier of fact need not *** be satisfied beyond a reasonable doubt as to each link in the chain of circumstances." *Hall*, 194 Ill. 2d at 330. Accordingly, this court is not required to search out all possible explanations consistent with innocence or be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. On the contrary, we must ask, after considering all of the evidence in the light most favorable to the prosecution, whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.

In the present case, we answer that question in the affirmative. Winifred Forrest and Michael Cunningham testified regarding defendant and Hunter's association. Further, Deosha Singleton made a statement to Detective Gannon wherein she stated that she overheard defendant and Hunter speaking on the day of the murder. Considering this evidence in the light most favorable to the prosecution, it would be reasonable for a jury to conclude that defendant and Hunter were associates who both knew Demetrian Forrest.

Scott Rueter testified that Forrest was a witness prepared to testify and implicate defendant at defendant's trial for the murder of Angelo Williams. Michael Cunningham testified that he told defendant that if he were in defendant's situation he would pay Forrest not to testify. Cunningham further testified that defendant expressed his desire not to go back to prison. Considering this evidence in the light most favorable to the prosecution, it would be reasonable for a jury to

conclude that defendant knew Forrest was prepared to implicate him in the murder of Angelo Williams. From this, it would also be reasonable for a jury to infer that defendant had a strong motive to kill Forrest.

Cunningham also testified to seeing defendant in possession of at least one handgun. Considering that testimony in the light most favorable to the prosecution, it would be reasonable for a jury to conclude that defendant possessed or had access to a handgun.

Officers Brandel, Street, and Derbort testified to the events surrounding the chase and eventual capture of defendant and Hunter. Moreover, the officers testified to their actions in recovering various items of evidence. Considering this evidence in the light most favorable to the prosecution, it would be reasonable for a jury to infer that defendant and Hunter had just murdered Demetrian Forrest, were running from the scene of the crime when they were seen by police, and thereafter fled, dropping evidence along their path (including the murder weapons and clothing). The officers' testimony also supports the inference that defendant was hiding when he was found in the bushes at 1304 East Clay.

Forensic pathologist Travis Hindman and forensic scientist Robert Hunton testified regarding the types of handguns and ammunition they believed were used in the murder of Forrest. Considering their testimony in the light most favorable to the prosecution, it would be reasonable for a jury to conclude that the guns recovered by police were actually used to kill Forrest.

Teronica Jones testified regarding her relationship with Hunter, including the fact that she had a child with him. She also testified to the fact that she had lent Hunter her car and picked it up the morning after the murder. At trial, Jones' testimony regarding the location of the car was inconsistent with a written statement she had completed shortly after the murder occurred, which indicated she found it somewhere southwest of the scene of the crime. Considering this evidence in the light most favorable to the prosecution, it would be reasonable for a jury to trust Jones' written statement over her trial testimony and thus infer that defendant was running toward a getaway car when he was caught at 1304 East Clay, southwest of the scene of the crime.

Misty Gilman testified that, after hearing gunshots, she looked out her window at 1423 East Prairie and saw five persons, including one wearing a Chicago Bulls jacket. Gilman had completed a written statement, however, that contradicted this testimony and indicated that she only saw three persons. Considering her testimony, as well as her contradictory written statement, in the light most favorable to the prosecution, it would be reasonable for a jury to conclude that her testimony should carry little weight or that two of the persons she reported seeing in her written statement were defendant and Hunter.

Tamara Hodges testified that upon hearing gunshots, she looked out her window at 1363 East Prairie Street and saw two men run north on Stone Street, hop into a car, and drive off. She also testified, however, that the car did not squeal its tires or make any remarkable sound as it drove off. Considering this in the light most favorable to the prosecution, it would be reasonable for a jury to conclude that Hodges' testimony shed little light at all on the case, or even that the two individuals she observed jump into a sports car had nothing to do with the murder.

The above conclusions and inferences are not the only conclusions and inferences that could be drawn. They are reasonable, however, and taken together they support a finding that defendant was guilty beyond a reasonable doubt of the first degree murder of Demetrian Forrest. This finding is further supported by the fact that this court has "consistently held that a conviction may be based solely on circumstantial evidence." *People v. Patterson*, 217 Ill. 2d 407, 435 (2005); *Hall*, 194 Ill. 2d at 330 ("Circumstantial evidence is sufficient to sustain a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged"). Moreover, we have previously utilized motive and flight in support of a finding that the evidence was sufficient to support a finding of murder beyond a reasonable doubt. *People v. Moore*, 171 Ill. 2d 74, 95-96 (1996).

After considering all of the evidence in the light most favorable to the prosecution, then, we hold that the record evidence reasonably supports a finding that defendant was guilty of first degree murder beyond a reasonable doubt in that: (1) defendant or someone for whose conduct he was legally responsible performed acts that caused Forrest's death; and (2) when defendant or someone for whose

conduct he was legally responsible performed those acts, he intended to kill or do great bodily harm to Forrest, knew his acts would cause Forrest to die, or knew his acts created a strong probability that Forrest would die or suffer great bodily harm. See 720 ILCS 5/9–1(a)(1), (a)(2) (West 1998).

## II. Propriety of the Prosecutor's Closing Argument

Having found the evidence in this case sufficient to convict, we still must analyze defendant's claim that the prosecutor's closing statements violated his federal and state constitutional rights to a fair trial, thus entitling him to a new trial. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2; *People v. Johnson*, 208 Ill. 2d 53, 64 (2003). Defendant asserts that reversal of his conviction is required because of what he contends was the prosecutor's repeated and intentional misconduct. In his brief before this court, defendant argues that the prosecutor improperly vouched for police credibility, attacked the integrity, tactics, and number of defense counsel, and disparaged defendant's former counsel. In his motion for a new trial, defendant also argued that the prosecutor improperly persisted in stating that he was representing the victims. Whether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue this court reviews *de novo*. *People v. Graham*, 206 Ill. 2d 465, 474 (2003).

This court has expressed concern with the problem of prosecutorial misconduct several times in recent years. See, *e.g.*, *Johnson*, 208 Ill. 2d at 64-67 (describing the problem of prosecutorial misconduct in great detail); see also *People v. Blue*, 189 Ill. 2d 99 (2000); *People v. Moss*, 205 Ill. 2d 139, 191 (2001) (Freeman, J., concurring in part and dissenting in part, joined by Kilbride, J.). We have pointed out that a criminal defendant, regardless of guilt or innocence, is entitled to a fair, orderly, and impartial trial. *Blue*, 189 Ill. 2d at 138. Further, we have noted an "intolerance of pervasive prosecutorial misconduct that deliberately undermines the process by which we determine a defendant's guilt or innocence." *Johnson*, 208 Ill. 2d at 66. Additionally, we have noted that "threats of reversal, and

words of condemnation and disapproval, have been less than effective in curbing prosecutorial misconduct." *Johnson*, 208 Ill. 2d at 66-67. With this case, we reaffirm our intolerance of prosecutorial misconduct.

As an initial matter, we address the State's contention that many of the prosecutor's statements to which defendant now objects are forfeited. To preserve claimed improper statements during closing argument for review, a defendant must object to the offending statements both at trial and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) ("*Both* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial" (emphases in original)). Defendant failed to properly observe the above rule regarding certain specific statements, including all of the prosecutor's statements concerning the credibility of the police officers, the prosecutor's "sole champion" statement concerning his representation of the victim, and the prosecutor's "brainwashing" statement concerning the integrity, tactics, and number of defense counsel. Additionally, defendant failed to properly object to the cumulative effect of the closing argument.

Considering the above we will focus our attention on the statements properly objected to. We note, however, that closing arguments must be viewed in their entirety, and the challenged remarks must be viewed in context. *People v. Caffey*, 205 Ill. 2d 52, 131 (2001), citing *People v. Macri*, 185 Ill. 2d 1, 62 (1998) (and cases cited therein). Accordingly, the simple fact that defendant did not properly object to a statement does not render that statement as if it never existed. Indeed, all statements must be considered as part of the entirety of a prosecutor's closing argument, and even statements not properly objected to may add to the context of a remark properly objected to.

Prosecutors are afforded wide latitude in closing argument. *Caffey*, 205 Ill. 2d at 131. In reviewing comments made at closing arguments, this court asks whether or not the comments engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them. *People v. Nieves*, 193 Ill. 2d 513, 533 (2000). Misconduct in closing argument is substantial and warrants reversal and a new trial if the improper

remarks constituted a material factor in a defendant's conviction. *People v. Linscott*, 142 Ill. 2d 22, 28 (1991). If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted. *Linscott*, 142 Ill. 2d at 28.

Defendant argues that the prosecutor in this case improperly attempted to gain sympathy from the jury by implying that the State was disadvantaged considering that each defendant had two attorneys working together, seeking to trick and deceive the jury. The prosecutor pointed out that "contrary to representations made to you during the jury selection or *voir dire*, you have seen with your own eyes, these are not two completely different independent teams of lawyers." The prosecutor further asked the jurors to "watch with our own eyes as they converse frequently. One will go back and ask another for assistance; one will talk to another attorney; then, go back and start asking the same questions or different questions." Defendant points out that while the prosecutor made the above arguments, he also opposed severance and sought the death penalty, entitling defendant and Hunter to two attorneys each by supreme court rule. See 188 Ill. 2d R. 416(d) ("In all cases wherein the State has given notice of its intention to seek the death penalty *** the trial judge shall appoint an indigent defendant two qualified counsel").

Later in his closing, the prosecutor noted that the four defense attorneys had "in excess of 100 years of legal practice and 75 years of school grilling Shane Brandel." The defense objected, the court sustained the objection, and the prosecutor rephrased his statement, asking the jurors to consider who was questioning Officers Brandel and Street. Again the defense objected. This time the court overruled the objection.

Still later, the prosecutor analogized the defense lawyers to "Monday morning quarterbacks," who can "dissect, bisect, and magnify any past action, all with the benefit of 20/20 hindsight and all with the benefit of time in numbers. But in the final analysis, the attorneys weren't there risking their lives on March [12, 1999]. They were not in the arena." After the court overruled an objection by the defense, the prosecutor continued, noting that "[t]he policeman were in the arena." He stated that "the rules of the game at which attorneys

defend, operate, and go under seem to require a complete perfection on the part of a witness." He argued that these rules allow attorneys to reveal an imperfect witness "to be a liar, the witness to be stupid, or the witness to be confused." When another objection was overruled, the prosecutor noted that this "render[ed] the witness unworthy of belief. But in the everyday real life world in which we all live, there is no perfection. In the real world, we judge each other by a less exacting standard."

The prosecutor asked the jurors to "think of any 2 minutes in your life in which you could withstand a full day of cross-examination by a four-lawyer team." Following a brief exchange, the prosecutor noted that the defense attacked the police reports completed by Officers Brandel and Street and then pointed out that "as a citizen, when you call the police, you expect an instant response. Even sooner if your life is at stake." At this point, the prosecutor argued that you do not want to call 911 only to be told by dispatch that the police officers are busy typing reports, will not be sent out to the street until the reports are finished, and " 'for your information, just came in from a murder case, and we know how exacting[ly] the defense attorneys will cross-examine them.' " The court sustained a defense objection and informed the jury to disregard the comment.

In his very next statement, however, the prosecutor continued with his performance as a dispatcher stating: " '*We know how closely their words will be examined; so, you can expect an additional 4 or 5 hours before the officers will be available so they can make sure that every word i[s] perfect, all syntaxes*.' " (Emphasis in original). This time the court overruled the defense objection and allowed the prosecutor to continue. The prosecutor obliged, stating, " '*Every word is perfect, all syntaxes are acceptable, and all paragraphs are sufficiently long enough to gain approbation from anyone*.' " (Emphasis in original.)

Sometime after the above comments, the prosecutor took issue with defendant's former counsel, who testified at trial that she had "an idea" that Forrest would be a witness against defendant in a separate murder trial, but did not "know" this to be the case. The prosecutor characterized her testimony as conducted "at the behest of Jacoby Wheeler's attorney" and "revolting to any person who values the truth." After the court sustained an objection to that

characterization and instructed the jury to disregard the comment, the prosecutor continued, comparing the testimony of defendant's former counsel to that of former President Clinton in regards to the Monica Lewinsky affair.

Still later, the prosecutor brought up photographs introduced by the defense and showing the alley where Brandel claimed to have chased the suspects. During trial, the prosecutor had objected to the photographs on the ground that the foliage was different. Defense counsel responded that the photos were offered only to show physical structures and layout and offered to stipulate that the pictures did not fairly and accurately portray the vegetation around the alley in March 1999. The court found defendant's argument persuasive and noted that the photos were not admitted to show the vegetation around the alley. In closing argument, the prosecutor argued that over two years later "somebody decides, well, it might be nice to have some pictures and it might be nicer if we took them in the summertime which is completely different from the winter as far as foliage and growth and, maybe, the Jury will fall for it." After a defense objection was overruled, the prosecutor rhetorically asked, "How serious are they about giving you accurate and fair information?"

Defendant asserts that these statements constituted personal attacks upon the defense attorneys, beyond the limits of propriety, and were calculated solely to inflame the passions and prejudice of the jurors. Defendant argues that the prosecutor's strategy was to attack the honesty, integrity, and intelligence of those who opposed or inconvenienced his efforts to win a conviction. The jury could either rely on the testimony of the testifying police officers or face a situation where no officers were available to respond to 911 calls because they were too busy wasting their time writing painstakingly complete and accurate police reports. Defense counsel, like defendant's former attorney, were dishonest because they parsed words like former President Clinton and introduced evidence that inaccurately portrayed the facts.

Defendant argues that in a closely balanced case such as this, where no forensic evidence tied defendant directly to the crime, and the credibility of police testimony was key, the improper tactics used by the prosecutor amounted to a material factor in the conviction. Without the prosecutor's use of personal attacks, undermining

-26-

defense counsel's efforts to question police credibility, the jury could have acquitted the defendant. Supporting his position defendant points to *People v. Beringer*, 151 Ill. App. 3d 558 (1987). In that case, the defendant, Joseph Beringer, was tried for murder jointly with his brother. Though the court believed the evidence sufficient to sustain a conviction, it reversed because "[t]he State's brazen misconduct insured that the defendant would not receive a fair trial." *Beringer*, 151 Ill. App. 3d at 564. Evaluating various challenged remarks made by the prosecution, the *Beringer* court noted that "[a]ccusations of deceptions between the defense counsels and personal attacks on defendant's attorney served no purpose except to prejudice the jury."*Beringer*, 151 Ill. App. 3d at 564.

The State argues that the portions of the prosecutor's closing argument that were preserved for review, even if viewed as improper, were not so egregious that they created an unfair trial or were a material factor in the verdict. According to the State, the jury's verdict was based upon the fact that defendant had a strong motive to kill Forrest, fled from the police leaving a trail of evidence, and was eventually caught hiding in a bush. The prosecutor's rhetoric, the State asserts, had nothing to do with the verdict.

Additionally, the State argues that defendant's reliance on *People v. Beringer* is misplaced. In *Beringer*, the prosecutor personally attacked a defense attorney, stating he thought her " 'incapable of courtesy to other people.' " *Beringer*, 151 Ill. App. 3d at 563. Moreover, the prosecutor in *Beringer* violated this court's decision in *People v. Nuccio*, 43 Ill. 2d 375, 381 (1969), by suggesting through cross-examination that a witness solicited payment for his testimony without presenting rebuttal evidence to support the charge. *Beringer*, 151 Ill. App. 3d at 559-60. Here, the State points out, the prosecutor's conduct did not amount to a direct personal attack on defense attorneys, the prosecutor did not commit a *Nuccio* violation, and the prosecutor did not argue that defense counsel suborned perjury.

Further, the State asserts that the trial court acted to reduce any chance of prejudice by sustaining several of defendant's objections, instructing the jury to disregard some of the prosecutor's comments, and by instructing the jury on the proper view of attorney arguments. The State points out that in *People v. Moore*, 171 Ill. 2d 74, 105-06 (1996), this court held that "[t]he act of sustaining an objection and

properly admonishing the jury is usually viewed as sufficient to cure any prejudice."

We agree with the State that there are significant differences between this case and *Beringer*. Further, we acknowledge and reaffirm the proposition that the act of sustaining an objection and properly admonishing a jury is generally sufficient to cure prejudice engendered by improper closing argument. We do not believe that ends the analysis, however.

Closing argument must serve a purpose beyond inflaming the emotions of the jury. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005); *Johnson*, 208 Ill. 2d at 87-88 ("Our system of justice requires that a defendant's guilt or innocence be determined based upon relevant evidence and legal principles, upon the application of reason and deliberation by a jury, not the expression of misdirected emotion or outrage by a mob"). A prosecutor cannot use closing argument simply to "inflame the passions or develop the prejudices of the jury without throwing any light upon the issues." *People v. Halteman*, 10 Ill. 2d 74, 84 (1956). Moreover, it is improper for a prosecutor to utilize closing argument to forge an "us-versus-them" mentality that is inconsistent with the criminal trial principle that a jury fulfills a nonpartisan role, under the presumption that a defendant is innocent until proven guilty. *Johnson*, 208 Ill. 2d at 80.

The prosecutor's closing argument in this case, considered in its entirety, appears deliberately designed to forge just the sort of "us-versus-them" mentality decried by this court in *Johnson* and foster a situation where jurors might feel compelled to side with the State and its witnesses in order to ensure their own safety. At the very outset of his remarks, the prosecutor suggested that he was the "lone" and "solitary figure" left to "champion the deceased" while "bearing the burden" of "avenging another's death." Later, he proposed that he was outnumbered by the defense attorneys, who were not interested in presenting the jury with accurate information but only strove to prove the police witnesses as liars. Moreover, through his mock presentation of a 911 call, he suggested that if the jurors felt that previously completed written police reports had to precisely corroborate police testimony at trial, police officers will no longer be able to effectively respond to emergencies, and the jurors might, in effect, compromise their own safety in the future. This strategy flows

throughout the prosecutor's closing and is particularly evident when the statements properly objected to are considered in view of the rest of his closing argument and in context.

The prosecutor told the jurors that they lived "sheltered lives" but a different dangerous world existed, "full of dangerous people" and "mean streets." He argued that while Shane Brandel and Dan Street, "the new breed of policeman," "men who are educated, intelligent, and well-spoken," formed the "thin blue line" to protect the jurors, witnesses called by the defense would not be called when "someone is breaking into their house or assaulting them." The prosecutor stated that his opinion of a witness who testified unfavorably to the State was that "his elevator doesn't run all the way to the top floor." Finally, in wrapping up his argument on rebuttal, the prosecutor cautioned the jury away from "being brainwashed" by the fact that "you hear everything twice" from the defense while it only gets the chance to "hear the prosecution's story once."

We acknowledge that the trial court sustained some of defendant's objections during the prosecutor's closing arguments and instructed the jury that closing arguments are not evidence and any statements or arguments made at closing that are not based on the evidence should be disregarded. We point out, however, that we have previously held that "[i]nstructing the jury that arguments are not evidence will not, in every instance, cure the defect caused by introduction of such evidence." *Blue*, 189 Ill. 2d at 132.

Further, we have held that the salutary effect of sustaining an objection is eliminated where a prosecutor persists in continuing that improper argument. *People v. Weinstein*, 35 Ill. 2d 467, 471 (1966). In this case, while some of defendant's objections were sustained, in certain situations, the trial court improperly allowed the prosecutor to continue the same line of argument unchecked. This situation is clearly evident in the exchange between defense counsel, the court, and the prosecutor regarding the mock 911 call.

Considering the above, we find that a chief goal of the prosecutor's closing argument in this case was to inflame the passions and prejudices of the jury, uniting the interests of the jurors in their own safety with that of the interests of the State in convicting defendant. Such a goal is improper. The prosecutor in this case was not content to rely upon the strength of the State's evidence. He did

not make a few solitary improper remarks. Instead, he utilized improper remarks, some unsupported by the evidence, to advance an "us-versus-them" theme. This theme was built piece by piece and is evident from the very beginning as the prosecutor launched his closing by portraying himself as a lone avenging champion. The theme continued throughout the prosecutor's argument and was advanced over objection and in spite of admonishment. The prosecutor suggested that police efficiency and expedience were more important than accuracy, and thereby urged the jurors to consider their own safety in deliberation rather than deliberating only on the actual guilt or innocence of defendant. See *People v. Erickson*, 117 Ill. 2d 271, 290 (1987) (where this court noted that the jury serves a truth-seeking role and is impaneled to decide a defendant's guilt or innocence).

We believe that in a case like this, relying heavily on the credibility of the testifying police witnesses, the prosecutor's utilization of closing arguments to inflame the passions and prejudices of the jury constituted a material factor in defendant's conviction. Without those arguments, a contrary verdict could have been reached. We cannot say with confidence that the prosecutor's improper remarks did not contribute to defendant's conviction. Accordingly, a new trial should be granted. This finding makes it unnecessary for this court to address defendant's arguments regarding ineffective assistance of counsel and trial error in refusing to excuse juror Brian Thomas. We still must consider, however, defendant's arguments regarding the offers of proof concerning William Ellzey.

### III. Refusal of the Defendants' Offers of Proof Regarding William Ellzey

Finding that defendant is entitled to a new trial, we will address, for the purposes of that new trial, defendant's claims regarding certain offers of proof. Defendant argues that the trial court erred in refusing to allow evidence showing that William Ellzey, a reputed gang leader and drug supplier against whom Forrest had testified, also had a motive to kill Forrest. This court has recognized that evidentiary rulings are within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion. *People v. Robinson*, 217 Ill. 2d 43, 62 (2005); *People v. Pulliam*, 176 Ill. 2d 261, 276

(1997). The controlling principles concerning the admissibility of evidence are well settled. The court must ask whether the proferred evidence fairly tends to prove or disprove the offense charged and whether that evidence is relevant in that it tends to make the question of guilt more or less probable. *People v. Caffey*, 205 Ill. 2d 52, 114-15 (2001), quoting *People v. Ward*, 101 Ill. 2d 443, 455-56 (1984). It is entirely within the discretion of the trial court to "reject offered evidence on grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty, or possibly unfair prejudicial nature." *People v. Harvey*, 211 Ill. 2d 368, 392 (2004), citing *Ward*, 101 Ill. 2d at 455.

Defendant points to the principle that each party is entitled to present evidence which is relevant to its theory of the case. *People v. Molsby*, 66 Ill. App. 3d 647 (1978). Moreover, defendant notes that one accused of a crime may prove facts and circumstances tending to show that the crime was committed by someone other than himself. *People v. Dukett*, 56 Ill. 2d 432, 450 (1974), quoting *People v. Nitti*, 312 Ill. 73, 90 (1924). While this is true, it is also true that defining the precise limits controlling the admission of such evidence is difficult and if the evidence is too remote in time or too speculative to shed light on the fact to be found, it should be excluded. *Dukett*, 56 Ill. 2d at 450, quoting *Nitti*, 312 Ill. at 90.

The defense argues that its proffered evidence regarding Ellzey would have countered and weakened the motive evidence presented by the State. Specifically, defendant argues that showing the jury that Forrest was an informant in other cases and had testified against William Ellzey, the highest ranking Gangster Disciple in Decatur, would show that someone other than defendant had a motive to kill Forrest. This evidence would have been bolstered by the rejected evidence that Forrest lost some of Ellzey's drugs; was behind in payments to Ellzey; had been physically disciplined for presenting Ellzey with a gold necklace instead of a cash payment; and had some relationship with Ellzey's girlfriend. Additionally, the evidence would have been supported by testimony from Forrest's grandmother, which the trial court did not allow, expressing her apprehension about Demetrian's safety after he testified against Ellzey.

Evaluating evidentiary rulings, this court only finds an abuse of discretion where "the trial court's ruling is arbitrary, fanciful,

unreasonable, or where no reasonable person would take the view adopted by the trial court." *Caffey*, 205 Ill. 2d at 89. This is not such a case. In *People v. Morgan*, 142 Ill. 2d 410, 440 (1991), *rev'd on other grounds*, *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222 (1992), we held that the fact that a third party had threatened the victim with a handgun a week before the victim's murder was not enough to link that third party to the murder. We held the evidence concerning the third party's threat "remotely speculative *** at best" because the defendant in that case presented no other evidence linking the third party to the crime. Accordingly, we found the proffered evidence properly excluded. *Morgan*, 142 Ill. 2d at 442.

In this case, the evidence concerning Ellzey is even more speculative. As our appellate court pointed out, Ellzey had no connection to the scene of the crime and, in fact, was in prison at the time of the murder. No evidence was offered that Ellzey arranged for Forrest's murder. No evidence was offered establishing that any other member of the Gangster Disciples was present at the scene of the crime nor was any evidence offered indicating that other members of the Gangster Disciples even cared about Ellzey's downfall.

Further, we agree with the appellate court that the testimony of Demetrian Forrest's grandmother concerning her apprehension due to his testimony against Ellzey was irrelevant. Her testimony did not tend to make the existence of any fact of consequence to the determination of defendant's guilt more or less probable than it would be without the evidence. See *People v. Illgen*, 145 Ill. 2d 353, 365-66 (1991). Furthermore, we note that the trial court informed defendant that he was free to argue that someone else murdered Forrest, just not Ellzey in particular. Accordingly, we find that the trial court did not abuse its discretion in refusing defendant's offers of proof.

CONCLUSION

Because we believe that statements made by the prosecutor during closing arguments in this case warrant the granting of a new trial, we reverse the judgments of the appellate and circuit courts and remand to the trial court. We do so, however, having established that the appellate court was correct in deciding that the evidence in this case was sufficient to convict defendant and that the trial court acted

within its discretion when it excluded evidence offered by defendant to show that William Ellzey, in particular, killed Forrest.

We note that because we found the evidence in this case sufficient to convict defendant, there is no double jeopardy impediment to a new trial. *People v. Roberts*, 214 Ill. 2d 106, 126 (2005); *People v. Fornear*, 176 Ill. 2d 523, 535 (1997). We further note, however, that our analysis regarding the sufficiency of the evidence is not indicative of any finding as to defendant's guilt that would be binding on retrial. *Roberts*, 214 Ill. 2d at 126; *Fornear*, 176 Ill. 2d at 535.

*Judgments reversed;*
*cause remanded.*