2021 IL App (1st) 190054-U

No. 1-19-0054

Order filed May 11, 2021.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 19490 |
| | ) | |
| DRASHUN WILSON, | ) | The Honorable |
| | ) | Thaddeus L. Wilson, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE LAVIN delivered the judgment of the court.
Justices Pucinski and Cobbs concurred in the judgment.

**ORDER**

¶ 1     *Held*: The circuit court's summary dismissal of defendant's postconviction petition is affirmed over defendant's contention he raised an arguable claim that trial counsel provided ineffective assistance by failing to file a motion to suppress defendant's custodial inculpatory statements where it is not arguable a successful motion to suppress would have changed the outcome of trial.

¶ 2     Defendant Drashun Wilson appeals the circuit court's summary dismissal of his *pro se*

postconviction petition at the first stage of review. Defendant contends he raised an arguable claim

trial counsel rendered ineffective assistance by failing to file a motion to suppress his inculpatory statements to an Assistant State's Attorney where he made those statements after requesting and being denied an attorney while in police custody, and after a detective falsely promised defendant would be released if he signed an inculpatory statement. We affirm.

¶ 3    Defendant was charged with attempted first-degree murder and aggravated battery with a firearm arising out of the shooting of Floyd Fulton on September 23, 2012. Following a jury trial, defendant was found guilty of one count of attempted first-degree murder and one count of aggravated battery with a firearm and and was sentenced to 31 years' imprisonment on the attempted murder count. On direct appeal, defendant challenged being tried as an adult rather than a juvenile as well as his sentence; we affirmed. *People v. Wilson*, 2016 IL App (1st) 141500. Our supreme court affirmed as well. *People v. Hunter*, 2017 IL 121306.[1]

¶ 4    This appeal only concerns defendant's postconviction claim of ineffective assistance with respect to trial counsel's decision not to file a motion to suppress defendant's inculpatory statements to an Assistant State's Attorney while in custody. Thus, we recite only the trial evidence necessary to decide this appeal.

¶ 5    At trial, Floyd Fulton testified he was walking on East 59th Street beween South Wabash Avenue and South Michigan Avenue at approximately 2:30 p.m. on September 23, 2012. As he approached an alley, he heard someone say, "[T]hat's one of them, go get him," then saw someone pointing at him, followed by flashes and banging sounds. As Floyd ran back toward Wabash, he felt a hot bullet on his tongue and spit it out, along with his teeth. He sat down in a parking lot and

_____

[1]Defendant's appeal to the supreme court was consolidated with the appeal of a defendant named Kevin Hunter.

realized he had been shot in the mouth. Nearby police officers summoned an ambulance and he was transported to the hospital.

¶ 6     Alvin Thomas testified he lived on the 5900 block of South Wabash on September 23, 2012. At approximately 2:30 p.m., he was outside with his family when he saw six males walking through the alley next to his apartment building. Defendant, whom Thomas identified in court, was one of the males walking through the alley; he was wearing a blue Cubs jacket and a black skullcap. Thomas saw defendant's face from 10 to 15 feet away. Thomas saw defendant "had his hand in his right pocket moving kind of fast" and the butt of a gun protruding from his right pocket. Thomas saw defendant walk toward a vacant lot, then return to the alley, where he saw defendant's face again from 20 to 25 feet away. He saw defendant point a gun toward 59th Street and fire twice. Defendant turned and ran away.

¶ 7     Police arrived three to four minutes later and Thomas described defendant to them. Approximately 30 minutes thereafter, Thomas identified defendant in a show-up. Thomas told police he recognized defendant's face and Cubs jacket. At trial, Thomas identified the Cubs jacket and skullcap defendant wore on September 23, 2012, which were entered into evidence.

¶ 8     Thomas testified two video recordings accurately depicted the events of September 23, 2012.[2] The State moved these video recordings into evidence. While viewing the video recordings, Thomas identified himself and his apartment building. He also identified six young men walking in the alley next to his building, one of whom was defendant, then walking toward a vacant lot. Only defendant was wearing a blue Cubs jacket. Thomas identified defendant returning to the

_____

[2]The trial exhibits, including these video recordings, are not included in the record on appeal. Defendant agrees the video recordings depict an individual with the same build as him wearing a Cubs jacket and a black skullcap.

alley, pulling a gun out of his pocket, raising it in his hand, firing it toward 59th Street, then running away.

¶ 9      Chicago police officer Reginald Ward testified he was on duty and driving an unmarked police vehicle at approximately 2:30 p.m. on September 23, 2012. A dispatcher stated a person had been shot near 59th and Wabash and the offender was wearing a blue Cubs jacket and a skullcap. Five to ten minutes later, Ward saw defendant, whom he identified in court, wearing a blue Cubs jacket and a skullcap near East 63rd Street and South Indiana Avenue, six to seven blocks southeast of the shooting. Ward identified defendant's clothing in court. He detained defendant. Shortly thereafter, Thomas arrived and identified defendant as the shooter. Ward arrested defendant and searched him, but did not recover a gun.

¶ 10     Assistant State's Attorney (ASA) Sarah Karr testified she was working in the Felony Review Unit on September 24, 2012. At approximately 5:30 p.m., she went to a police station, met with a Detective Stanek, and interviewed defendant, whom she identified in court. Stanek was present for Karr's initial interview of defendant. Karr gave defendant *Miranda* warnings, including advising him of his right to an attorney and that an attorney would be provided for him if he could not afford one. Defendant indicated he understood his rights and agreed to speak with Karr. Defendant told Karr he shot at a man while walking with a group of friends the day before.

¶ 11     Karr asked Stanek to leave the room, which he did, and she asked defendant how the police had treated him. Defendant "said that he had been treated well by the police and by the detective. He said that he had been given food to eat and something to drink and that he was giving this statement with [her] freely and voluntarily." Defendant also said no threats or promises had been

made to him prior to Karr's arrival. Karr did not make any threats or promises to defendant and did not see police personnel make any threats or promises to him.

¶ 12 Defendant agreed to give a typewritten version of his statement and sat next to Karr as she used a computer to type that statement. When she finished, Karr printed out the typewritten statement and confirmed defendant could read it. She reviewed the first paragraph of the statement with him, which reiterated his *Miranda* rights. Defendant indicated he understood his *Miranda* rights and signed his name next to the first paragraph to indicate as much. Karr read the entire typewritten statement aloud as defendant followed along. Defendant corrected certain typographical errors and added a line to his statement; he and Karr initialed these changes. Karr and defendant signed the bottom of each page to indicate each page was correct.

¶ 13 Karr identified defendant's typewritten statement, which was entered into evidence, and read it to the jury. The typewritten statement indicated defendant understood he had the right to have an attorney present during questioning, and that if he could not afford to hire an attorney, one would be appointed to represent him before any questioning.[3] Defendant agreed to give the statement and signed his name to indicate as much.

¶ 14 In relevant part, the typewritten statement reflected defendant told Karr he was with a group of friends at approximately 2:30 p.m. on September 23, 2012. While they were walking through an alley near 59th and Wabash, a friend gave defendant a loaded gun, which he put in his left pocket. Defendant saw a man with dreadlocks wearing all black passing the alley, and defendant's friends told him to shoot. Defendant held the gun in both hands and fired it four times toward the

---

[3]As noted above, although the typewritten statement was entered into evidence, it is not part of the record on appeal. Karr read the typewritten statement into the trial record.

man wearing black. The man in black started running after defendant fired the first shot; defendant did not know if the shots he fired struck anyone. Defendant ran down the alley and threw the gun while he was running. Defendant was arrested as he was walking toward South King Drive; police told him people had identified him as the shooter. Defendant was wearing a blue Cubs jacket, black pants, a black hat, and Timberland boots on the day of the shoting.

¶ 15    The typewritten statement also reflected defendant stated he had "been treated well by the police and Assistant State's Attorney Sarah Karr." "[N]o threats or promises had been made to him to get him to make this statement and he [was] giving this statement freely and voluntarily." "[E]verything contained in this statement is true and correct."

¶ 16    Evidence technician William Stec testified he administered a gunshot residue kit to defendant, whom he identified in court, at a police station within two hours of the shooting. Stec inventoried the gunshot residue kit, which he identified in court.

¶ 17    Illinois State Police forensic scientist Mary Wong testified she performed testing on the gunshot residue kit Stec administered to defendant. She opined defendant discharged a firearm, was in the environment of a discharged firearm, or came into contact with gunshot residue.

¶ 18    Defendant testified he was 17 years old on September 23, 2012. At approximately 2:30 p.m. that day, he heard the sounds of a shooting, but did not see or participate in it. When defendant heard gunshots, he "ran the other way." Approximately 30 minutes later, he was arrested and transported to a police station.

¶ 19    Defendant acknowledged he signed the typewritten statement, but denied the statement was true. He signed it because police had him "locked up for so long," he "was just ready to go home," and "the detective" said he would be released to his mother if he signed the typewritten

statement. Defendant had been in custody for "a day or two" when he signed the typewritten statement.

¶ 20    Defendant acknowledged there was gunshot residue on his hands. He testified he fired a "small handgun" at a friend's house on September 23, 2012, but did not fire a gun at anyone and did not attempt to kill Fulton.

¶ 21    On cross-examination, defendant testified he fired a gun at his friend's house between 10:00 and 10:30 a.m. At approximately 2:00 p.m., defendant was alone on South Calumet Avenue, a "few blocks away from 59th and Wabash," when he heard four or five gunshots. He was wearing a Cubs jacket and a black skullcap. Defendant acknowledged an individual in the video recordings was also wearing a Cubs jacket and a black skullcap, but denied that was him.

¶ 22    "[T]he detective" told defendant to say yes to any questions Karr asked him. Defendant spoke to two detectives, both of whom were white men, but he could not remember their names. The second detective "made promises" to defendant about signing his statement to Karr.

¶ 23    Defendant denied he sat next to Karr as she prepared the typewritten statement. Karr had the typewritten statement with her when she first spoke to defendant. She read "parts" of the statement to defendant, and told him to "browse through it" and then initial it to "make it seem like it's legit."

¶ 24    In rebuttal, Karr testified she did not prepare defendant's typewritten statement prior to meeting with him. She did not tell him to "browse though this statement to make sure it seems legit." Defendant did not mention any promises a detective made to him regarding signing the typewritten statement.

¶ 25    In closing, the State argued defendant's "admission," the testimony of the eyewitnesses, defendant's clothing, the gunshot residue evidence, and the video recordings established his guilt. Defendant argued Thomas's identification of him was unreliable and contended the typewritten statement was "the words of the State's Attorney," not defendant's own words. In rebuttal, the State argued defendant's claim Karr prepared his typewritten statement before meeting him was incredible given that the statement contained personal details about defendant's life Karr could not have known in advance.

¶ 26    The jury found defendant guilty of both attempted first-degree murder and aggravated battery with a firearm, and that defendant personally discharged a firearm that proximately caused great bodily harm to another during the commission of attempted first-degree murder. The trial court merged the counts and sentenced defendant to 31 years' imprisonment on the attempted first-degree murder count.

¶ 27    On direct appeal, defendant challenged his sentence and his trial as an adult rather than a juvenile, but did not raise any claims of ineffective assistance. We affirmed. *Wilson*, 2016 IL App (1st) 141500. Our supreme court granted leave to appeal and affirmed as well. *Hunter*, 2017 IL 121306.

¶ 28    In 2018, defendant filed a *pro se* petition under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)). In relevant part, this petition alleged trial counsel provided ineffective assistance because he "failed to file a motion to suppress [defendant's] statement involuntarily given to the detective and [S]tate's [A]ttorney during interrogation." Specifically, defendant claimed he requested an attorney when Stanek interviewed him at the police station, but Stanek responded "the only people who needed a lawyer are the guilty ones" and did not allow

defendant an attorney. Defendant also alleged "the detective told him he would be going home once he signed the document." Stanek then brought defendant to Karr, who obtained inculpatory statements from defendant, which were introduced against him at trial. Defendant argued counsel's failure to move to suppress these statements prejudiced him because his "confession" was "the primary evidence to support the [S]tate[']s case." Defendant attached an affidavit averring, in relevant part, he "did not shoot or cause bodily harm to" Fulton, he "signed a bogus statement because the detective told [defendant he] would go home after [he] signed it," he "didn't understand what was going on and requested a lawyer," and his "attorney did not consult with [him] prior to trial."

¶ 29    The circuit court summarily dismissed defendant's petition at the first stage of review. The court explained defendant's petition did not allege he told trial counsel he asked Stanek for an attorney while in custody. The court reasoned that, because trial counsel did not know of this potential violation of defendant's constitutional rights, counsel could not be faulted for not filing a motion to suppress defendant's statements. In addition, the court found Karr's testimony rebutted defendant's claims about the coerced nature of his statements. Finally, the court found that "even if the confession had been suppressed, it is not arguable the outcome would have been different."

¶ 30    On appeal, defendant contends the circuit court should not have dismissed his petition because it raised an arguable claim trial counsel was ineffective for failing to file a motion to suppress his inculpatory statements to ASA Karr. Specifically, defendant argues counsel should have moved to suppress these statements because Karr obtained them after "(1) Det. Stanek refused to honor [defendant's] demand for counsel, and (2) [defendant] was promised he would be released after 24 hours of interrogation if he signed a false confession."

¶ 31    "The [Post-Conviction Hearing] Act provides a remedy to a criminal defendant whose federal or state constitutional rights were substantially violated at trial or sentencing." *People v. Dupree*, 2018 IL 122307, ¶ 28. Proceedings under the Act consist of three stages of review. *People v. Johnson*, 2018 IL 122227, ¶ 14.

¶ 32    The circuit court dismissed defendant's petition at the first stage. At the first stage, a defendant's petition need only state the "gist" of a constitutional claim. *People v. Bailey*, 2017 IL 121450, ¶ 18. The circuit court may only dismiss a petition at the first stage if a defendant's claims are " 'frivolous or patently without merit,' " which means the claims have "no arguable basis either in law or in fact." *People v. Boykins*, 2017 IL 121365,  ¶ 9 (quoting 725 ILCS 5/122-2.1(a)(2) (West 2014)). Courts must give *pro se* petitions "a liberal construction" and review them "with a lenient eye, allowing borderline cases to proceed." (Internal quotations and citation omitted.) *People v. Hodges*, 234 Ill. 2d 1, 16-17 (2009). We review the dismissal of a postconviction petition at the first stage *de novo*. *Boykins*, 2017 IL 121365, ¶ 9.

¶ 33    A criminal defendant has the right to effective assistance of trial counsel. U.S. Const., amend. VI; *Strickland v. Washington*, 466 U.S. 668, 686 (1984). At the first stage, a postconviction petition alleging ineffective assistance must show "(i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *Hodges*, 234 Ill. 2d at 17.

¶ 34    To state a claim counsel was ineffective for failing to file a motion to suppress, a defendant must establish prejudice by showing "the unargued suppression motion is meritorious, and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *People v. Henderson*, 2013 IL 114040, ¶ 15. "[I]f it is easier to dispose of an

ineffective assistance claim on the ground that it lacks sufficient prejudice, then a court may proceed directly to the second prong and need not determine whether counsel's performance was deficient." *People v. Givens*, 237 Ill. 2d 311, 331 (2010). Lack of prejudice is a proper basis for first-stage dismissal of a postconviction petition. *People v. Gardner*, 2013 IL App (2d) 110598, ¶ 19.

¶ 35    Even taking as true defendant's allegations Stanek ignored his request for an attorney and falsely promised to release him if he signed the typewritten statement, we find no arguable merit to the claim the jury would have acquitted defendant if trial counsel had successfully moved to suppress these statements. The evidence against defendant was overwhelming, even absent his statements. There is no dispute Floyd was shot near an alley on 59th Street between Michigan and Wabash at approximately 2:30 p.m. on September 23, 2012. Thomas saw defendant fire a gun toward 59th Street while in an alley between Michigan and Wabash at approximately 2:30 p.m. on September 23, 2012, accurately described his clothing to police, and identified him in a show-up approximately 30 minutes later. Thomas also identified defendant as the shooter at trial and in video recordings that corroborated Thomas's description of events and his description of defendant. Defendant himself acknowledged he was wearing a Cubs jacket and black skullcap on September 23, 2012.

¶ 36    In addition, Officer Ward apprehended defendant within minutes of the shooting, six to seven blocks away from the scene, wearing clothing that matched Thomas's description. The gunshot residue evidence supported an inference defendant fired a gun on the afternoon of September 23, 2012. Altogether, the jury's verdict was supported by direct eyewitness testimony about the shooting, an immediate eyewitness identification of defendant to police, video recordings

of defendant firing a gun, and gunshot residue evidence. There is no basis for us to conclude the suppression of defendant's statements to Karr would have resulted in an acquittal. Because defendant cannot show there is any probability the trial outcome would have been different had his statements been suppressed, he cannot establish even arguable prejudice under *Strickland*. See *Henderson*, 2013 IL 114040, ¶ 15. Thus, his ineffective assistance claim fails.

¶ 37    Defendant argues the introduction of his inculpatory statements was prejudicial because they contradicted his claim he was not involved in the shooting. It is true defendant's statements to Karr contradicted his trial testimony. However, that does not mean the suppression of those statements would have changed the outcome of trial, which is the definition of prejudice under *Strickland*. See *Id.* Other evidence also contradicted defendant's claim of innocence, such as Thomas's direct observation of defendant firing a gun and his identification of defendant approximately 30 minutes after the shooting. The jury could have rejected defendant's claim he was not involved in the shooting based on Thomas's testimony alone. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) (testimony of a single credible witness is sufficient to convict).

¶ 38    Defendant also contends the evidence was not overwhelming because it was "circumstantial and reliant on the testimony of [Thomas,] whose memory of the gunman was tainted by his participation in an unduly suggestive show-up identification." However, even if all the evidence in this case were circumstantial, the State may prove its case by circumstantial evidence alone. *People v. Wheeler*, 226 Ill. 2d 92, 120 (2007). In addition, defendant's claim the show-up in which Thomas identified defendant was unduly suggestive is immaterial to his claim of ineffective assistance. The jury would have heard testimony about the show-up identification regardless of whether defendant's statements were suppressed. Accordingly, we find defendant

has failed to establish arguable prejudice under *Strickland*, and we affirm the first-stage dismissal of his postconviction petition.

¶ 39    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 40    Affirmed.