NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220364-U

NO. 4-22-0364

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 7, 2023
Carla Bender
4ᵗʰ District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| LESLIE ROLFE, | ) | No. 21CM1632 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Gibbons, |
| | ) | Judge Presiding. |

_____

JUSTICE KNECHT delivered the judgment of the court.
Justices Turner and Lannerd concurred in the judgment.

**ORDER**

¶ 1   *Held*:  (1) Defendant has not met his burden of proving his claim that his convictions for obstructing a peace officer and disorderly conduct were invalid as they violated his right to free speech.

(2) The evidence is sufficient to support defendant's convictions.

¶ 2   In December 2021, defendant, Leslie Rolfe, was convicted of obstructing a peace officer (720 ILCS 5/31-1(a) (West 2020)) and two counts of disorderly conduct (*id.* § 26-1(a)(1) (West 2020)). He was sentenced to 12 months' probation. Defendant appeals, arguing (1) his convictions must be vacated as they punish him for engaging in protected speech on a public sidewalk and (2) the evidence was insufficient to sustain his convictions. We affirm.

¶ 3   I. BACKGROUND

¶ 4   In August 2021, defendant was an activist, seeking racial justice in his

community. He recorded podcasts and wrote messages in chalk on the sidewalks around Rockford's city hall. Some of the messages targeted police and council members. Others memorialized individuals who lost their lives, including one young man defendant reported had been repeatedly shot by police. The chalk messages often contained expletives. Defendant had observed individuals wash his sidewalk messages. When this occurred, defendant would film the individuals as they washed the messages, provide commentary, and then post the footage on Facebook.

¶ 5 On the afternoon of August 13, 2021, defendant saw Kyle and Marge Bevers using a power washer to remove his chalk writings and memorials from the sidewalks. Defendant began filming the couple and, with commentary, posted the video on Facebook Live. Defendant approached Kyle and Marge, calling them names like "racist a*** m***" and followed them as they washed away his chalk messages. During the confrontation, Kyle sprayed and pushed defendant. Kyle testified defendant appeared to lunge at him. An unnamed individual called 911. The police arrived and defendant was later arrested.

¶ 6 For the August 13, 2021, events, defendant was charged with obstructing a peace officer (*id.* § 31-1(a) (West 2020)) and two counts of disorderly conduct (*id.* § 26-1(a)(1) (West 2020)). Specifically, for obstructing a peace officer, the State asserted defendant knowingly obstructed Officer Matthew Williams's investigation of a crime, an authorized act within his official capacity, "in that he followed and yelled at witnesses who[m] the officer interviewed for his investigation" while knowing Officer Williams was a police officer engaged in executing his official duties. As for the disorderly-conduct charges, the State alleged a separate charge for Kyle and for Marge: "defendant knowingly acted in such an unreasonable manner as to alarm and

disturb [Kyle and] Marge Bevers, and provoke a breach of the peace, in that said defendant yelled profanities at [Kyle and] Marge Bevers and shoved a cell phone in [their] face[s] to record [them]."

¶ 7    Defendant's jury trial on these charges was held in December 2021. At that trial, the State played a recording of a substantial part of the August 13, 2021, confrontation. The State also called Kyle, Marge, and Officer Williams to testify. Defendant testified on his own behalf.

¶ 8    The video of the interaction between defendant and the Beverses is approximately eight minutes long. It begins showing a wet sidewalk with letters written in chalk. There is no audio at the beginning, but approximately 14 seconds in, a man, identified as defendant, is heard saying, "We got this ... we got this racist m*** over here coming to wash [(unintelligible)]." Then, as Marge is exiting a storefront across the street from where Kyle is power washing the sidewalk, defendant refers to Marge. As he repeats, "Here goes his racist a*** wife. Here goes his racist a*** wife," defendant follows Marge across the street. He approaches Kyle, who continues to wash the sidewalk with a power washer that is on a trailer attached to a sport utility vehicle (SUV). Defendant continues to refer to the couple as "racist m***" and "racist a*** wife."

¶ 9    The video reveals a number of words written in chalk on the sidewalk. Not all words are clear on the video either because of the angle of the recording or because parts or all of the words had already been washed away. The word "F***" is seen in one area and in another "People That Support RACISTS." As Kyle washes another chalked "f***" from the sidewalk, the video shows defendant's feet within two or three feet of Kyle's feet. The video pans to Kyle's face, making it seem that the phone is within a foot of Kyle's face. Kyle continues to

wash the words on that corner of the sidewalk. While these events occur, defendant speaks loudly to those watching the video, saying the following: "The world would be better without racist m\*\*\* like this. The world would be better without racist m\*\*\* like this. When they die they'll go right into obscurity. His white a\*\*\* will die and go right into obscurity." Defendant continues, "This stupid m\*\*\* got a[n] end hunger [(END HNGR)], he got a[n] end hunger license plate, and he out here doin[g] racist a\*\*\* shit like washing away chalk." Defendant further refers to the Beverses as "a racist Mr. and Mrs. Smith." He says, "They'll be dead in about five years. I hope somebody give 'em Covid. \*\*\* Somebody come and cough on these m\*\*\* face and give 'em Covid." Kyle repeatedly tells defendant to "[g]et off the hose." Defendant responds, in part, "Man, f\*\*\* your hose," and calls Kyle a "racist m\*\*\*" and a "racist piece of s\*\*\*."

¶ 10　　　　Defendant follows closely behind Kyle as Kyle continues to wash the sidewalk. When defendant stands in front of Kyle, Kyle tells defendant to get out of the way. Defendant yells for Kyle to get his hands off him.

¶ 11　　　　At one point, Kyle hands the washer wand to Marge as he seems to straighten the hose. Marge continues to wash the chalk. Defendant's phone appears to be recording within a couple feet of Marge's face as Marge washes the sidewalk. Defendant repeatedly and loudly yells "racist m\*\*\*." Defendant tells the viewers, "This is what Rockford look[s] like." At approximately 4:19 into the video, Kyle turns and sprays defendant with the power washer. Defendant appears to fall or drop the camera and the video goes dark for a few seconds. When the video resumes, defendant is heard telling others near him, in a level of volume best described as a speaking level, "Let it be; let it be. Don't call 'em. No, no, don't call them. No, don't call

them. *** The police seen them." At the first corner the viewers see approximately four other people within 10 feet or so of defendant and the Beverses. Like defendant, one of those individuals is seen recording the events.

¶ 12          After power washing that first corner, Kyle and Marge move to another corner across the street. Kyle drives the power washer as Marge walks and meets him there. Defendant walks along and then behind the vehicle, on the opposite side from Marge, as the vehicle moves forward. Defendant loudly informs the viewers about the memorial on the corner: "16-year-old" and "shot three times as he was crawling away." On that second corner appear the words "F*** the Police" and "REST IN POWER Lil Mike." The video pans up a light pole to which two photographs and a sign that reads, "MICHAEL 'LIL MIK' SAGO JR OCT 1ST 2011," are attached.

¶ 13          While at this second corner, Kyle starts to roll out the hose to begin washing as defendant continues yelling. Marge yells "shut up" at defendant. This causes the volume of defendant's yelling to increase even louder: "You shut up, m***. I'll talk as much as I want. Eat a d***. I'll talk as much as I want, you racist m***. I'll talk as much as I f*** want. I'll talk as much as I f*** want. Look at this s***."

¶ 14          As Kyle washes the second corner, defendant yells at his viewers: "Somebody give this m*** Covid." He then yells at Kyle, "You ain't makin' it to no hospital. You ain't makin' it to no hospital." Before Marge enters the SUV to pull away, she shouts through her mask something to defendant, which cannot be heard on the video either because Marge's voice was muffled or because, at this point, the video's audio begins to cut out. Defendant responds by yelling even louder. Because of the audio difficulties, only pieces of what defendant is shouting

can be heard. The snippets include: "go f*** yourself," "my mother," "grandmother," "proud," "piece of s***," and "cracker." Kyle wraps up the hose, and he and Marge drive away. The video ends.

¶ 15        Kyle, age 72, testified, on the afternoon of August 13, 2021, he and his wife Marge were on State Street in downtown Rockford washing chalk writings off the sidewalk. Kyle, who had lived in the Rockford area for 40 years, knew a festival weekend was approaching. The chalked writings "looked terrible" and were "offensive *** to shoppers and people who participate *** in the festival." Kyle emphasized the writings were "certainly not appealing *** for parents with little children." The language was "very negative," including "F's this" and "some racist statements and things." Kyle testified he performed most of the power washing while Marge assisted.

¶ 16        While Kyle and Marge power washed the sidewalks, someone began yelling and screaming at them. The individual used racial slurs and statements. Defendant approached Kyle. Defendant called Kyle, "a slave owner, a racist." There were "numerous [insults] and [he] repeated them over and over and over again." Kyle testified defendant's volume was "very high." Defendant was screaming. During the confrontation, defendant was "six or eight feet to two or three feet away from [Kyle]." Defendant also held his phone and recorded the events.

¶ 17        When asked what the offensive words said, Kyle testified some of the writings were local "politicians['] names" and things like "f*** the mayor" or "f*** the police." The writings called the police and politicians racist.

¶ 18        Kyle admitted he sprayed defendant with the power washer. When asked the reason he did so, Kyle stated defendant "made a rather sudden quick move and it looked like a

- 6 -

lunge coming toward me."

¶ 19    After washing one corner, Kyle and Marge moved their power washing to the next corner and began washing there. Defendant approached. Kyle explained the following: "At one point he was, when I was trying to clear the hose up to move, he was standing with his foot on the high[-]pressure hose, would not take his foot off it. I pushed him off of it[,] and he stumbled backwards and I think fell at the curb and then came up and was swinging at me."

¶ 20    After the State asked Kyle if any contact was made, Kyle testified as follows: "He did not contact me with his fist or anything. Something contacted me. It could have been the power[-]washer wand and had a scratch and a bruise on my cheek and on my arm."

¶ 21    Kyle testified defendant followed him to record Kyle on the driver's side of his vehicle. At that time, according to Kyle, he "was very concerned and somewhat fearful of what was going to happen." Kyle attributed his fear to "the threats and the fact that he kept pushing toward me and yelling just some of the nasty things he was saying." Kyle felt threatened. Neither he nor Marge called 911. Kyle testified he was "concerned or there was some fear of apprehension about what was, what was going to happen, what he was going to do."

¶ 22    On cross-examination, Kyle testified he tried not to engage with defendant. Kyle stated they did not complete the power washing. He did not know if he washed a memorial off the sidewalk: "I don't know if I'd call it a memorial or not. I, I was just erasing all the chalk on the sidewalk that was, where I was washing, regardless of what it said."

¶ 23    Marge, age 77, explained why she and Kyle went to clean the sidewalks on August 13, 2021:

"We decided that after more than a year of inflammatory

- 7 -

language over loudspeakers and chalk on the sidewalks that we'd,

we'd really had enough and we wanted to express our views and

clean the sidewalks because that night was City Market and it was

also the week of 815 day. And we just we wanted to clear things

up so that the children and the families walking to the festival

would not have to see those things and hear those things. We

couldn't do anything about what they were going to hear but we

could help with what they were going to see."

When asked what inflammatory words she observed, Marge testified "the F-word was everywhere." There were comments about the police and city officials.

¶ 24　　　　Marge testified, while cleaning the sidewalk, defendant approached. Defendant had "a voice like a foghorn." Everyone "for blocks around" could hear him. When asked how close defendant got to her, Marge testified she was not certain, but within four to five feet. When asked how she felt physically when defendant was "doing those actions" toward her, Marge stated the following: "Terrible. It was, it was off putting. It was scary, frightening language and, you know, I'm fortunate that I've spent a lot of time in my career and my volunteer work with people. But that was the most, that's the most I've ever heard." Marge's heart rate was "[n]ot good." Marge reported the confrontation "was really, it's very disturbing." Marge testified, "It was somewhat frightening, but, you know, it was still under control because there was some distance between us. But it was scary." Marge testified she did not call 911.

¶ 25　　　　Regarding the interaction with the police, Marge testified when she first spoke to police, defendant was nearby. At that time, she and Kyle had already washed "a couple of

quadrants." She concluded someone must have called the police. Kyle and Marge stopped washing to talk to the police. Per the police officer's request, they stopped washing and moved their vehicle. Once they moved, the police tried to interview them. At this time, defendant yelled at the police officer.

¶ 26        On cross-examination, Marge testified no government agency asked them to clean the sidewalks. Defendant approached them "the minute [they] got out and [were] working on the first quadrant." They did not leave the area despite defendant's arrival but continued power washing. Around the third or fourth quadrant of the intersection, Marge turned to defendant and said, "[Y]our mother and your grandmother would be very ashamed of you today."

¶ 27        On redirect examination, Marge testified, while she was speaking with the officer, defendant said they "were all racists and *** slave owners." There were "a variety of other things peppered with the F-word." Marge said her heart rate was not good during the incident and "some of the memories are a little bit foggy as a result." Marge also said, "there's a lot of stress." When the police instructed the Beverses to go behind the city hall, Marge believed defendant was instructed to follow them.

¶ 28        Matthew Williams, an officer with the Rockford Police Department, testified, on August 13, 2021, around 1:30 p.m., he heard radio traffic of officers responding to a call regarding "a disorderly" at First Street and State Street. The complaint was that an elderly couple was "being harassed by a black male." Officer Williams, in uniform and in a marked police car, responded to the call. When Officer Williams pulled up just shy of the intersection, he could see a silver minivan with a small trailer carrying a power washer and garbage cans. An older white couple was on the sidewalk "doing something." Officer Williams observed defendant, whom he

recognized, yelling at the couple. Officer Williams stayed in his vehicle waiting for other units to arrive. While he sat in his vehicle, Officer Williams saw the couple enter their minivan as the argument continued and then saw them pull the trailer up the block. Officer Williams followed. He pulled up behind them and exited his car. Officer Williams approached and recognized Kyle. Kyle and Marge retrieved the power washer and began spraying the sidewalk.

¶ 29 Officer Williams testified he asked Marge if everything was okay. It was not "very long" before defendant "and a couple other people" approached. Defendant "was very agitated, yelling some nasty stuff towards the police and then was addressing [the Beverses], calling them racists and all kinds of stuff." Defendant referred to the police as "racist-a\*\*\* cops." Officer Williams believed "there was an F-word in there somewhere." Each time Officer Williams attempted to talk to Marge about the earlier events, defendant "very loud[ly]" yelled, "racist-a\*\*\* b\*\*\* and so forth."

¶ 30 Officer Williams testified defendant's yelling prevented him from hearing or speaking to Marge. Because of the yelling, Officer Williams was unable to "get a story from either party." In addition, Officer Williams testified the yelling created "an officer safety issue." He clarified, "[w]hen people are agitated and yelling at us it [presents] more of a threat." He was trying to separate the parties to hear their stories.

¶ 31 Officer Williams attempted to deescalate the situation. When he first attempted to hear Marge and talk to the parties, there was still constant yelling. Officer Williams decided to move the parties to the parking lot so they could "have a better conversation." Once Officer Williams arrived at the back parking lot, he informed the other officers to meet him there as it was "a better spot than being out front." It was not long before defendant arrived. Defendant

- 10 -

walked down the sidewalk and continued to yell at "us." In the parking lot, defendant continued to call the police racists and to yell at the Beverses. He continued to video the interaction. Defendant was very loud and very agitated. It was "difficult to conduct [the] investigation."

¶ 32    After telling defendant "a couple of different times to back up," Officer Williams testified, although he did not "know what's going on here," he decided he was "going to solve the yelling issue right now." Officer Williams felt defendant "was obstructing [the] investigation." As Officer Williams could not communicate with anyone due to "the yelling and so forth," he took custody of defendant and put him in the squad car.

¶ 33    On cross-examination, Officer Williams testified it was approximately 1:15 p.m. when he "received a dispatched ticket" to the location. Officer Williams agreed when he observed defendant he did not see him "doing anything physical," other than "slapping the board off the trailer when it left." These events occurred in downtown Rockford in the middle of the day when there were people around.

¶ 34    The following questions and answers occurred when Officer Williams was asked about what he learned during his investigation:

"Q. So based on the dispatch to what you had observed and then everything up until the point before the parties were behind City Hall, anything you learn from Marge or Kyle Bevers during an, in an interview? Nothing you learned during that interview substantially changed anything that you had already observed; is that right?

A. Correct. I didn't know—yeah. All I know is what I saw

- 11 -

initially. And once I was trying to talk with everybody, until we got to the back and then had basically separated the parties, then, then I was able to talk to the Bevers[es].

Q. And so once you were done talking with the Bevers[es], essentially anything they told you you already were aware of, right?

A. Well, no.

Q. As far as my client[’s] conduct anything that they might have told you about my client's conduct you had already observed; is that right?

A. Well, observed part of it, yes. I wouldn't say I observed [it] all, no.

Q. Sure. But did you—

A. I just observed that short little snippet, yep."

¶ 35 Testifying on his own behalf, defendant stated, on August 13, around 1 p.m., he was near Rockford City Hall drawing chalk memorials. When he saw the Beverses washing away the chalk messages, defendant retrieved his phone and began to film live. Defendant commented on what they were doing. When asked if he was upset by the Beverses' actions, defendant replied he was not. He had experienced this regularly. When this occurred, he would film the washing and provide commentary for those who watched the events over Facebook Live. The interaction with the Beverses lasted "maybe about 15 to 20 minutes" before the police arrived. In that time, the Beverses did not leave other than to move to a nearby location to

- 12 -

continue power washing.

¶ 36　　　　When defendant first approached Kyle and Marge and began filming live, the two had just finished power washing the memorial at the first corner. As Marge entered the passenger side of the car, "she gave [him] the middle finger and she smiled." At the second corner, Kyle sprayed defendant's legs and face with the power washer, lacerating defendant's eye and knee. After he was arrested, he was taken to the hospital for those lacerations, as well as for lacerations to his hands and for a concussion.

¶ 37　　　　Defendant testified Officer Williams approached. He gave defendant orders, with which defendant complied. Defendant denied he stopped the officer from doing his job.

¶ 38　　　　On cross-examination, defendant acknowledged the word "f***" appeared within the chalk drawings. When asked if he had any previous interaction with the Beverses that led him to calling them racist, defendant responded his "first interaction with them is why [he] called them racist." This included the power washing, as well as them having given him the middle finger and being assaulted and battered by Kyle.

¶ 39　　　　The State recalled Officer Williams for rebuttal examination. Officer Williams testified he took defendant to the hospital after he learned defendant wanted medical attention. Officer Williams asked defendant if he wanted to tell him his side of the story. Defendant responded he did not feel comfortable talking to him. In the back of the ambulance, defendant told another officer he did not want to pursue charges and did not want to file a police report.

¶ 40　　　　The jury found defendant guilty. The trial court sentenced him to 12 months' probation. This appeal followed.

¶ 41　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 42                                    A. First Amendment

¶ 43            Defendant initially argues his convictions must be vacated as they punish him for

protected speech on a public sidewalk in violation of the first amendment's protections.

Defendant emphasizes his case "consists of nothing more than speech," as he "never touched or

even closely approached any of the alleged victims." Defendant cites multiple cases establishing

that the first amendment protects various types of speech, including vulgar or inflammatory

language: *Watts v. United States*, 394 U.S. 705, 708 (1969) (a threat to shoot the president as part

of political hyperbole); *Cohen v. California*, 403 U.S. 15, 16, 20 (1971) ("Fuck the Draft" on an

article of clothing); *Snyder v. Phelps*, 562 U.S. 443, 459 (2011) (peaceful picketing with

inflammatory language on signs at funerals of soldiers). Defendant contends his statements,

though offensive to some, are protected speech, and his convictions improperly punished him for

exercising his free-speech rights.

¶ 44            The State counters by rejecting the premise defendant's convictions were based

on words alone. The State further emphasizes the trial court's conclusion, when ruling on

defendant's motion for a directed verdict at the close of the State's case, defendant's conduct in

addition to use of fighting words implied a threat to Kyle and Marge.

¶ 45                                    1. *Forfeiture*

¶ 46            In his reply brief, defendant highlights the State's brief and its undeveloped

argument in response to his claim his convictions violated the first amendment. Defendant urges

this court to reverse his convictions upon finding the State conceded his first-amendment

contentions or by finding them forfeited under Illinois Supreme Court Rule 341(h)(7) (eff. Oct.

1, 2020).

- 14 -

¶ 47　　　　We find the State has not forfeited the ability to challenge defendant's first-amendment claims. In this appeal, the State is the appellee. Rule 341(h) and its subsections expressly apply to the "Appellant's Brief." *Id.* Moreover, it is well-established this court may affirm on any basis appearing in the record. See *Akemann v. Quinn*, 2014 IL App (4th) 130867, ¶ 21, 17 N.E.3d 223. In so doing, we are not limited to only those arguments made by the State or appellee.

¶ 48　　　　　　　　　　2. *Defendant's Substantive Claim*

¶ 49　　　　The first amendment precludes Congress from enacting laws abridging the freedom of speech. *People v. Relerford*, 2017 IL 121094, ¶ 31, 104 N.E.3d 341. This first-amendment right "is a fundamental right protected from invasion by the state by the fourteenth amendment." *People v. Redwood*, 335 Ill. App. 3d 189, 192, 780 N.E.2d 760, 762 (2002). Because of that right, the government lacks power to limit expression based on its ideas, message, subject matter, or content. *Relerford*, 2017 IL 121094, ¶ 31. The right of free speech is not, however, "absolute at all times and under all circumstances." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942). "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Id.* at 571-72. "These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or incite an immediate breach of the peace." *Id.* at 572.

¶ 50　　　　The question of whether a statute as applied to a defendant's circumstances violates the first amendment is a legal one that we review *de novo*. See generally *People v. Swenson*, 2020 IL 124688, ¶ 19, 181 N.E.3d 116. While defendant acknowledges our review is

*de novo*, he attempts to place the burden on the State to prove his right to free speech was not violated. For instance, in his argument on this issue, defendant quotes *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816 (2000) (*Playboy*) as establishing, "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its action."

¶ 51        Defendant's contention regarding which party carries the burden of proof is misplaced; defendant bears this burden. *Playboy* is distinguishable. The governmental action in *Playboy* was a federal regulation that placed limits on sexually-oriented programming, a content-based speech restriction. See *id.* at 806, 827 (citing 47 U.S.C. § 561 (Supp. III 1994)). Here, in contrast, defendant does not make a facial challenge to any governmental content-based speech restriction, *i.e.*, argue the governmental regulation itself is invalid. Instead, defendant raises an as-applied challenge, arguing the circumstances surrounding his convictions for obstructing justice and disorderly conduct show those convictions, as applied to him, violate the first amendment. In other words, "the challenging party 'protests against how an enactment was applied in the particular context in which the [party] acted or proposed to act, and the facts surrounding the [party's] particular circumstances become relevant.' " *Swenson*, 2020 IL 124688, ¶ 19 (quoting *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 306, 891 N.E.2d 839, 845-46 (2008)). A party asserting an as-applied challenge under the first amendment bears the burden of showing the statutes that are the bases of his convictions were unconstitutionally applied to him. See *People v. Rollins*, 2021 IL App (2d) 181040, ¶¶ 15, 55-58, 183 N.E.3d 997 (finding the defendant, who raised an as-applied challenge to his convictions, failed to establish his convictions for child photography by a sex offender violate his first amendment right to free

- 16 -

speech). Thus, defendant, not the State, carries the burden of establishing his convictions violate his right to free speech.

¶ 52    Defendant has not, however, met this burden. Defendant's convictions are for two separate offenses: obstructing a peace officer (720 ILCS 5/31-1(a) (West 2020)) and disorderly conduct (720 ILCS 5/26-1(a)(1) (West 2020)). Case law shows convictions under both statutes may be obtained on words alone. See *People v. Baskerville*, 2012 IL 111056, ¶ 29, 963 N.E.2d 898 (holding "the offense of obstructing a peace officer under section 3101(a) *** does not necessitate proof of a physical act"); *People v. Gibbs*, 115 Ill. App. 2d 113, 115-16, 119, 253 N.E.2d 117 (1969) (affirming defendant's obstructing-a-peace-officer conviction when the defendant told those who were stopped they need not consent to a search and they should enter private property to force the police to acquire a warrant); *Redwood*, 335 Ill. App. 3d at 192 (observing charges for disorderly conduct under section 26-1 may punish spoken words alone).

¶ 53    The evidence establishes, however, defendant's convictions were not based on words alone. Regarding his obstruction conviction, the issue was not the content of the words used but the volume of those words and defendant's refusal to lower his voice to allow the officer's investigation to continue. Defendant, however, has cited no case law or other authority to show the volume of one's speech in light of an officer's efforts to investigate a reported crime is protected by the first amendment.

¶ 54    Regarding his disorderly-conduct convictions, the conduct of defendant included holding his camera near the faces of both Kyle and Marge and recording them, while continuing to hurl insults and shout obscenities. Defendant disputes that he shoved his phone into their faces, but the video appears to get very close to their faces. In addition, our case law establishes

"fighting words," which are "personally abusive epithets which, when addressed to an ordinary citizen, as a matter of common knowledge, inflict injury or are inherently likely to prove an immediate breach of the peace," that imply threats are unprotected and may, by themselves, support a disorderly-conduct conviction. *Redwood*, 335 Ill. App. 3d at 192. See *id.* at 193 (holding a speaker's fighting words, to be punishable under section 26-1, "must contain either an explicit or implied threat"). Even if we exclude defendant's conduct, the words used by defendant show an implied threat. Between calling Kyle and Marge "racist m***" and the like, defendant tells his viewers to cough on Kyle and give him COVID. He further tells Kyle repeatedly he will not make it to the hospital. He brings up death for both Kyle and Marge. He screams in a rage when Marge says something about his mother. Defendant has cited no argument or case law to show that these "fighting words" are protected speech, particularly in light of defendant's accompanying conduct.

¶ 55        Defendant has, therefore, not met his burden of establishing his convictions constitute an unlawful deprivation of his right to free speech.

¶ 56                              B. Sufficiency of the Evidence

¶ 57        Defendant next argues the evidence was insufficient to prove him guilty of the charged offenses beyond a reasonable doubt. When we review a challenge to the sufficiency of the evidence to support a criminal conviction, we consider the evidence "in the light most favorable to the prosecution" and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Ward*, 215 Ill. 2d 317, 322, 830 N.E.2d 556, 559 (2005). In this process, we consider the record as a whole and not only the evidence supporting the State's theory of the case. See *People v. Wheeler*, 226 Ill. 2d 92, 117,

871 N.E.2d 728,741-42 (2007)). We will not retry a defendant; "[t]he trier of fact is best equipped to judge the credibility of witnesses, and due consideration must be given to the fact that it was the trial court and jury that saw and heard the witnesses." *Id.* at 114-15.

¶ 58                                    1. *Obstructing a Peace Officer*

¶ 59        Defendant was charged with obstructing a peace officer under section 31-1(a) of the Criminal Code of 2012 (Code) (720 ILCS 5/31(a) (West 2020)). Section 31-1(a) states the following, in relevant part: "A person who knowingly resists or obstructs the performance by one known to the person to be a peace officer *** of any authorized act within his or her official capacity commits a Class A misdemeanor." *Id.* Defendant further cites case law showing one cannot be convicted of obstructing a peace officer unless the officer was materially impeded from the performance of the authorized act. See *People v. Comage*, 241 Ill. 2d 139, 150, 946 N.E.2d 313, 319 (2011).

¶ 60        Defendant's only challenge to the sufficiency of the evidence, other than the first-amendment challenge we addressed above, is the evidence does not show Officer Williams was materially impeded in his investigation. Defendant argues Officer Williams learned nothing more from the interview after his arrest and there was no actual obstruction as the officer was able to complete the investigation in a short time.

¶ 61        Viewing the evidence in the light most favorable to the prosecution, we find the evidence sufficient to support defendant's conviction. The testimony the jury believed was that Officer Williams could not conduct the investigation while defendant yelled at a volume that prevented him from communicating with Marge. This was corroborated by Marge's testimony and supported by the video seen by the jury, which demonstrated the volumes at which defendant

had been yelling at Marge and Kyle just minutes before. Defendant's conduct prevented the investigation from advancing; it had stopped. The offense had been completed, as defendant materially impeded Officer Williams's investigation. The investigation only continued after the arrest occurred and defendant was physically removed from the interview. A rational trier of fact could have found the elements of the offense proved beyond a reasonable doubt.

¶ 62                                  2. *Disorderly Conduct*

¶ 63          One commits disorderly conduct under section 26-1(a)(1) of the Code "when he or she knowingly *** [d]oes any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." 720 ILCS 5/26-1(a)(1) (West 2020). The State, in its charges against defendant, asserted defendant committed disorderly conduct by yelling profanities at the Beverses and shoving a cell phone in their faces to record them.

¶ 64          In arguing the evidence was insufficient to support his disorderly-conduct convictions, defendant contends the cell phone "was nowhere near their faces" and no one objected to the manner in which he was recording Kyle and Marge. He highlighted testimony showing he was two to eight feet from Kyle and further from Marge. Defendant also emphasizes they did not appear to be alarmed or disturbed as they continued power washing the sidewalks, did not call 911, and sprayed and shoved him.

¶ 65          When we view the evidence in the light most favorable to the prosecution, we see the evidence is sufficient for us to conclude a rational trier of fact could have found the elements proved beyond a reasonable doubt. The video shows defendant held his phone at times near the faces of Marge or Kyle as he continued to yell profanities at them. The yelling was incessant and loud. Defendant talked about their deaths and urged viewers to give them COVID. Defendant

yelled that Kyle would not make it to the hospital. There were others gathered around. Kyle testified he felt threatened. Marge testified to an increased heart rate and a foggy memory of the events, as well as to the experience being very disturbing and somewhat frightening. It was within the purview of the jury, who saw the video and observed the witnesses, to conclude, beyond a reasonable doubt, defendant behaved in an unreasonable manner so as to disturb or alarm Kyle and Marge and to provoke a breach of the peace.

¶ 66                             III. CONCLUSION

¶ 67        We affirm the trial court's judgment.

¶ 68        Affirmed.