2025 IL App (1st) 231379-U

No. 1-23-1379

August 20, 2025

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 14292-02 |
| | ) | |
| KENDELL COLE, | ) | Honorable |
| | ) | Geraldine D'Souza, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice Lampkin and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1     *Held*:   We affirm defendant's convictions for armed robbery and aggravated battery over his contention that prosecutorial misconduct deprived him of a fair trial.

¶ 2     Following a jury trial, defendant Kendell Cole (Defendant) was found guilty of armed robbery and aggravated battery and sentenced to an aggregate term of 40 years in prison. He appeals, arguing the prosecutor's misconduct during closing argument deprived him of a fair trial. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant was charged by indictment with two counts of attempted murder, one count of armed robbery, and one count aggravated battery arising from the shooting of Stefon Goodloe (Goodloe) on September 3, 2017. Codefendant Jason Isom (Isom) was charged by indictment with six counts of attempted murder, four counts of armed robbery, and one count of aggravated battery arising from the same incident. Defendant and Isom were tried jointly but represented by separate counsel.

¶ 5     At trial, Goodloe testified that on September 3, 2017, he was visiting his grandmother in Ford Heights, Illinois. He went outside to talk to his brother Jaquan Goodloe (Jaquan), his friend Tyler Carr (Carr), and his cousins, Arturo Cleveland (Cleveland) and Denikkos Hawkins (Hawkins). As they were making plans to go to the mall, someone arrived by vehicle and told Cleveland about a dice game happening around the corner. Goodloe and his companions decided to go to the dice game.

¶ 6     When they arrived, there were six people present. Goodloe recognized codefendant Isom among them. Goodloe sat on a bucket next to a window and watched as Isom played dice with Cleveland and Hawkins. At one point, Isom said, "Damn, you all just took 1500 from me, but it's okay, I'm going to get my money back because I know you got this, you got that, and you got that." Isom then went "off in the corner on his phone."

¶ 7     After the five others left, Isom stepped outside and came back inside with defendant, whom Goodloe identified in open court. Goodloe was not acquainted with defendant but noticed tattoos on his neck of a basketball on each side of the letters "BLR." Defendant was holding money in his hand, but neither defendant nor Isom entered the dice game. They stood around for a while, then

went outside again. Goodloe became suspicious and watched Isom and defendant through the window as they stood outside talking and smoking. Defendant then reentered the house and Isom followed. Defendant was no longer holding money but was "grabbing something" around his pants, "kind of concealing it."

¶ 8   Defendant pulled out a silver and black pistol, and Isom pulled out a small handgun with a green laser. They pointed their firearms at Goodloe and his companions, and defendant said, "Give me everything." Isom approached Hawkins and Cleveland, took their money and searched their pockets. Hawkins said, "Man, we could have [given] you your money back, you don't have to do this to us." Isom replied, "F*** that, I need everything." Meanwhile, defendant approached Jaquan and Carr and said, "Give me everything in your pockets." Jaquan and Carr complied.

¶ 9   Defendant then approached Goodloe, who remained on the bucket by the window, put the firearm in Goodloe's face, and told Goodloe to give defendant his money. Goodloe had a backpack containing $4000, his wallet containing $6, and two cell phones. Goodloe gave defendant the backpack, wallet, and cell phones. Defendant then told Goodloe to "get on the floor," and Goodloe obeyed. Defendant said, "I should pop one of you all bitch ass." Isom replied, "Which one?"

¶ 10   Defendant was then standing "literally next to [Goodloe] almost over" him, while Isom was standing to Goodloe's right pointing his firearm at Cleveland. Goodloe saw the green laser on Cleveland's chest. Goodloe heard a gunshot and felt as though something pushed him in his right upper buttock. Although he did not see defendant fire the shot, he knew defendant fired it by how loud and close the gunshot was to him. Goodloe then saw the green laser move away from Cleveland's chest. He heard Isom fire a shot. The shot did not hit Goodloe, but he felt something

graze his hand. Isom fired a second shot, which struck Goodloe's lower back. Goodloe felt "like air was being let out of" him, and he lost all sensation below his ribcage.

¶ 11    After the third shot, Goodloe heard "feet running across the floor, everybody just scattering everywhere." Goodloe feared being shot again and "play[ed] dead." After a few minutes, he opened his eyes and saw he was lying in a pool of blood. He tried to stand but could not. Goodloe crawled out of the house with his hands and yelled for help.

¶ 12    Paramedics arrived and transported Goodloe to a hospital. As a result of the shooting, Goodloe became paralyzed and confined to a wheelchair. He underwent surgery, suffered from pressure sores and constant pain, and lost control of his bladder.

¶ 13    While in the hospital, Goodloe identified defendant and Isom in photo arrays as the people who shot him. At trial, the State introduced video of Goodloe's identification, as well as photographs and police body-worn camera footage of the scene.

¶ 14    Goodloe testified during cross-examination that he was at the house for about 20 minutes before the shooting happened. He did not remember what time he left his grandmother's house or what time he was shot, but he recalled it was light outside at both times.

¶ 15    Officer Pascal Waller (Waller) testified that he took Goodloe's statement at the hospital with Assistant State's Attorney Anthony Gattuso (Gattuso), and that Goodloe identified defendant in a photo array as one of the shooters. Waller arrested defendant and observed he had tattoos of two basketballs and the letters "BLR" on his neck. The court sustained the State's objections to defense counsel's attempts to question Waller about mail recovered at the scene.

¶ 16    Kendall Jones (Jones) testified that on September 3, 2017, he lived in Ford Heights, Illinois. Jones said he could not recall where he was on that day and answered, "I don't remember," to the

State's questions. When asked whether he gave a recorded statement to police and identified individuals in a photo lineup, he responded, "I don't remember."

¶ 17   Officer Hector Mendez of the Cook County Sheriff's Department testified that he administered two electronic photo lineups to Jones. The State published a video of Jones viewing the photo lineup and identifying two perpetrators, including a man with tattoos of basketballs on either side of his neck.

¶ 18   Former Assistant State's Attorney Gattuso testified that he also interviewed Jones about the case and showed him photo arrays of suspects. The State published a video of the interview, dated September 5, 2017, in which Jones told Gattuso that he was present at the dice game on September 3, 2017, and identified two shooters in photo arrays. Jones stated that the shooters pointed guns at the dice game participants, searched their pockets, and took a backpack.

¶ 19   Officer William Evers of the Cook County Sheriff's Department testified that he collected two dice, two .9mm shell casings, three .40 caliber Smith & Wesson cartridge cases, and several projectile fragments from the scene.

¶ 20   After hearing closing arguments, the jury found defendant guilty of aggravated battery and armed robbery, but not guilty of attempted murder. It also found the State proved the allegation that defendant was armed with a firearm. The trial court denied defendant's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.

¶ 21   The trial court sentenced defendant to a term of 10 years in prison for armed robbery, plus a 15-year firearm enhancement, and a consecutive term of 15 years for aggravated battery, for an aggregate term of 40 years. It denied defendant's motion to reconsider.

¶ 22                                II. ANALYSIS

¶ 23 Defendant appeals, requesting we reverse his conviction and remand for a new trial because four remarks by the prosecutor in closing argument and rebuttal amounted to prosecutorial misconduct. Defendant concedes he forfeited these claims by failing to object to all but one of the remarks at trial or to raise any of them in his posttrial motion. See *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007) (objection both at trial and in a written posttrial motion are required to preserve a claim). He contends we may nonetheless review the alleged misconduct under either prong of the plain error doctrine, or as ineffective assistance of trial counsel for failure to preserve the issue.

¶ 24 We may grant relief under the plain error doctrine when "(1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The first step under either prong is to determine whether any clear or obvious error occurred. *People v. Reese*, 2017 IL 120011, ¶ 60. Here, we find no error.

¶ 25 "[A] criminal defendant, regardless of guilt or innocence, is entitled to a fair, orderly, and impartial trial." *Wheeler*, 226 Ill. 2d at 121-22. Misconduct in closing argument warrants reversal if improper remarks were a material factor in a defendant's conviction. *Id.* at 123. That is, a new trial should be granted if the jury could have reached a contrary verdict absent the improper remarks, or if the reviewing court cannot determine that the remarks did not contribute to the conviction. *Id.* We afford prosecutors "wide latitude" in closing argument, however, and we consider challenged remarks in their context. *Id.* at 122-23. We review *de novo* the legal question of whether a prosecutor's conduct was so egregious as to warrant a new trial. *Id.* at 121. We review each challenged remark in turn.

¶ 26    Defendant first challenges this statement in closing argument, in which the prosecutor discussed the location of shell casings recovered at the scene:

> "Now, ladies and gentlemen of the jury, these shell casings didn't appear out of thin air. We know the scene was secured until evidence technicians arrived. No one wa[s] able to get in and out of the home until then. *The bullets and the shell casings corroborate what the victim [Goodloe] told us, the truth*." (Emphasis added.)

Defendant contends that, in the italicized sentence above, the prosecutor improperly vouched for Goodloe's credibility. See, *e.g.*, *People v. Boling*, 2014 IL App (4th) 120634, ¶¶ 125, 127 (improper vouching where prosecutor stated, "I do think [the witness's] statements are credible. They are believable. They are honest."); *People v. Lee*, 229 Ill. App. 3d 254, 259-61 (1992) (improper vouching where prosecutor stated witness "happened to be extremely honest in my humble opinion").

¶ 27    It is generally improper for a prosecutor to personally vouch for the credibility of a State witness. *People v. Williams*, 2015 IL App (1st) 122745, ¶ 12. A prosecutor may, however, comment on a witness's credibility when such comment is based on facts in evidence. *People v. Pope*, 284 Ill. App. 3d 695, 706 (1996). Our supreme court has held that the statement, "We know that [the witness] was telling you the truth about what happened because we heard another witness in this case," was a fair comment on the evidence. *People v. Emerson*, 122 Ill. 2d 411, 435 (1987). Such comments are not improper where the jury would have to *infer* that the prosecutor was expressing his personal view, rather than the prosecutor explicitly stating, for example, "this is my personal view." *Pope*, 284 Ill. App. 3d at 707.

¶ 28    Here, the prosecutor's statement that the evidence "corroborates what the victim told us, the truth," was not an explicit expression of his personal opinion that Goodloe told the truth. Rather, as in *Emerson*, the statement was a "fair comment on the evidence;" namely, that the locations of the recovered shell casings corroborated Goodloe's testimony and thus bolstered his credibility. See *Emerson*, 122 Ill. 2d at 435. This was not a clear or obvious error.

¶ 29    Defendant next challenges this statement by the prosecutor in closing:

> "Now, the law in the State of Illinois recognizes, you know, that several years later witnesses like Mr. Jones when they come into a courtroom like this, with a judge sitting here, *with the defendant sitting right here*, circumstances may change. The law recognizes that. And you will get a very important instruction about that and it reads like this: 'The believability of a witness may be challenged by evidence that on some former occasion he made a statement that was not consistent with his testimony in the case.' " (Emphasis added.)

Defendant argues that the italicized phrase above shows the prosecutor "implied that Jones['] memory lapse was due to the fact that he was now sitting in a courtroom with [defendant] and feeling intimidated, scared or threatened." We disagree.

¶ 30    The prosecutor suggested several potential reasons "witnesses like Mr. Jones" might change their testimony, including the passage of time, changed circumstances, the presence of a judge, or the presence of the defendant. See *People v. Green*, 2017 IL App (1st) 152513, ¶¶ 86, 89 (no improper statement where prosecutor proposed several reasons the witness may have changed his story, including possibly being "scared"). Context makes clear that the prosecutor was

explaining to the jury how Jones' prior inconsistent statements were admissible evidence. This, too, was not a clear or obvious error.

¶ 31    Relatedly, defendant argues that when the prosecutor stated, in rebuttal to defendant's closing argument, "You all know why those people did not come in and testify," he implied other witnesses to the shooting did not testify because they were afraid of or threatened by defendant. Yet read in context, the prosecutor was responding directly to defendant's closing argument. Defense counsel in closing had stated it was "so convenient" that Waller could not recall whether mail was recovered from the scene and had disputed Goodloe's testimony that he was at the house for only 20 minutes before the shooting.

¶ 32    In rebuttal, the prosecutor responded,

> "And again, counsel's making these wild accusations about with [*sic*] the State's trying to hide from you, about this time and the mail. ***
>
> Not in a single jury instruction will you see the State must prove beyond a reasonable doubt what time it was. And not in a single jury instruction you will see the State must pro[ve] beyond a reasonable doubt who was at the house. Not in a single jury instruction will you see the State must prove beyond a reasonable doubt that all the people that were there come in and testify. You all know why those people did not come in and testify."

Considered in context, the prosecutor's statements were responsive to defendant's closing argument. See *People v. Glasper*, 234 Ill. 2d 173, 204-05 (2009) (no misconduct where defense invited prosecutor's statements in rebuttal).

¶ 33    Moreover, this court has found no misconduct where the prosecutor never stated or explicitly suggested a defendant threatened or intimidated a witness. See *People v. Davis*, 2018 IL App (1st) 152413, ¶¶ 69-72 (statement that jurors should "[u]se your common sense" as to why witness feared testifying was not improper where prosecutor did not explicitly suggest defendant threatened witness); see also *Green*, 2017 IL App (1st) 152513, ¶ 85 (statement, "The one time that [the witness] changes his story is when he's up there on the witness stand face-to-face with the killer," was not improper). The prosecutor here suggested that witnesses were reluctant to testify in court, but he nowhere explicitly attributed that reluctance to a threat by defendant or anyone else.

¶ 34    Defendant further argues these remarks implying Jones and non-testifying witnesses were intimidated by defendant were "made even more prejudicial and inflammatory because one juror had already expressed concern about juror safety." Counsel references an incident on the third day of trial in which a juror requested the court address the jurors by number rather than name when in defendants' presence. The court assured the juror that the juror cards would be sealed at the end of trial, the juror assured the court she could be fair and impartial, and the trial continued. On this basis, we cannot find the prosecutor's statements discussed above "played into" jurors' fears or "fueled the jury to use this fear" in reaching a (partial) guilty verdict, as defendant urges.

¶ 35    Finally, defendant challenges the prosecutor's statements in rebuttal that defense counsel was "merely trying to confuse" the jury, and to "not let them confuse you," claiming these comments disparaged defense counsel's integrity.

¶ 36    Again, context makes clear the prosecutor's statements in rebuttal were responsive to defense counsel's closing argument. Defense counsel in closing stated: "[Goodloe]'s there

between 1:00 o'clock and 2:00 o'clock, and he gets shot at 7:00. So what's he doing all that period of time? Drinking and smoking dope. That's what he's doing. And what's he doing—what was he doing these past few days? Coming here and lying in court[.]"

¶ 37    Then during rebuttal, the following exchange occurred:

"[ASSISTANT STATE'S ATTORNEY]: I didn't realize that 19-years-old [*sic*] when you walk into [a] house, there's booze, there's weed, I've got to drink, I've got to smoke. No, they keep saying that it's a fact, but what evidence have they presented to you that that happened? Zero. And again did he walk or did he ride there? That is not the question you are going to be asked to resolve. The question you're going to be asked to resolve is: Did these two shoot him? Did these two rob him? They are merely trying to confuse you—

[DEFENSE ATTORNEY]: Objection.

THE COURT: Overruled.

[DEFENSE ATTORNEY]: I'm not trying to confuse. Objection, and I want that on the record.

THE COURT: It's already on the record. It's been overruled. Continue, [assistant state's attorney].

[ASSISTANT STATE'S ATTORNEY]: They're trying to make you latch on to certain pieces of evidence that aren't relevant and say, well, the State didn't pro[ve] their case. Do not let them confuse you—

[DEFENSE ATTORNEY]: Objection again for confusion and make it for the record.

THE COURT: Overruled. Everything you say is on the record.

[DEFENSE ATTORNEY]: Improper argument.

THE COURT: Stop making the same objection. I've already ruled. Overruled.

[ASSISTANT STATE'S ATTORNEY]: — (continuing) as to what your job is to decide today. Did these two men shoot Stef[o]n Goodloe? Did they rob Stef[o]n Goodloe? That is the question you are asked to decide."

¶ 38   A prosecutor may not accuse defense counsel of attempting to create reasonable doubt by confusion, misrepresentation, or deception, but he "may fairly comment on defense counsel's characterizations of the evidence and may respond in rebuttal to statements of defense counsel that noticeably invite a response." See *People v. Willis*, 2013 IL App (1st) 110233, ¶ 110. In *Willis*, defense counsel argued in closing that the case was "completely covered and dripping with reasonable doubt" because of the lack of physical evidence. *Id.* ¶ 107. The prosecutor responded,

"There is no reasonable doubt in this case, folks. There [are] a lot of attempts to distract you, a lot of attempts to get you to focus on things that aren't here.

That's not what the law says you are to do. You are to follow the evidence that came from the witness stand, not things that they wish were here, not things that are attempts to distract you from what is here." *Id.* ¶ 108.

This court found the comments in rebuttal about defense counsel's "attempts to distract" were a legitimate response to the defense's closing argument. *Id.* ¶ 110.

¶ 39   Here, the prosecutor twice accused defense counsel of trying to "confuse" the jurors. However, we find the prosecutor's use of the word "confuse" similar to the comments in *Willis* of "attempts to distract" and "to get you to focus on things that aren't here." Considered in the context

of both parties' arguments, the prosecutor did not use these two phrases to imply that the defense's strategy was merely to deceive or to inflame the jury's emotions. See *id.* ¶ 101 (prosecution must make sure closing arguments serve a purpose other than merely inflaming the jury's emotions). Rather, he was responding to issues defense counsel raised in closing regarding Goodloe's alleged drug use and was attempting to redirect the jury's attention to the central facts of the case. As such, these comments fall within the prosecutor's "wide latitude" in closing argument.

¶ 40    Because we find no error in the State's argument, defendant cannot establish plain error under either prong. See *id.* ¶ 117 ("As we have found no reversible error, there can be no plain error.").

¶ 41    Defendant also argues, in the alternative, that his counsel's failure to preserve the alleged errors constituted ineffective assistance of counsel.

¶ 42    In reviewing a claim of ineffective assistance of counsel, we apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which asks (1) whether trial counsel's performance was deficient and (2) whether the deficiency prejudiced the defendant. See *People v. Albanese*, 104 Ill. 2d 504, 525-27 (1984) (adopting *Strickland*). A defendant must show that counsel's performance was "objectively unreasonable under prevailing professional norms" and that, but for the deficient performance, there is a reasonable probability the result would have been different. *People v. Cherry*, 2016 IL 118728, ¶ 24. Failure to establish either prong precludes a finding of ineffective assistance. *Id.*

¶ 43    As discussed above, none of the challenged statements constituted prosecutorial misconduct. Thus, any objection to them would have been overruled, and any posttrial motion raising them would have been denied. Failing to make futile objections is not deficient

performance. See *People v. Massey*, 2019 IL App (1st) 162407, ¶ 34. Defendant cannot show prejudice, either, as there is no reasonable probability the result would have been different if counsel had made the futile objections and raised the meritless issues posttrial.

¶ 44                                    III. CONCLUSION

¶ 45    For these reasons, we affirm the judgment of the trial court.

¶ 46    Affirmed.